

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| ARCHIE SAMUEL ROGERS, JR., | § | No. 08-22-00207-CR |
| Appellant, | § | Appeal from the |
| v. | § | 277th Judicial District Court |
| THE STATE OF TEXAS, | § | of Williamson County, Texas |
| Appellee. | § | (TC# 19-0267-K277) |

## MEMORANDUM OPINION

A jury convicted Appellant Archie Samuel Rogers, Jr. of murder and assessed punishment of life in prison. Appellant challenges his punishment in two issues, arguing that the evidence is legally and factually insufficient to support the jury's rejection of his sudden-passion claim. For the following reasons, we affirm Appellant's punishment associated with his conviction.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual background

#### (1) *Initial events*

Heather Hunt testified that she had been romantically involved with Appellant since 2010, and they married in 2017. Appellant, Hunt, and their daughter lived in a house on West Jackson

---

[1] This case was transferred from our sister court in Austin, and we decide it in accordance with the precedent of that court to the extent required by TEX. R. APP. P. 41.3.

Street in Bartlett, Texas. Appellant kept a handgun in a nightstand in the master bedroom because of a prior burglary. At the time of the offense, Hunt and Appellant were in the process of separating, but she and Appellant still lived together in the house and Appellant would occasionally leave for several days at a time.

On February 1, 2019, Hunt returned home from work and saw a car in the driveway that she did not recognize. Hunt walked into the master bedroom and found a woman Hunt did not know, later identified as Stormie Callison, dead under a blanket on the bed. Hunt called 911, and officers were dispatched to the house. Hunt also called Appellant's cell phone, but the call went to his voicemail.

### (2) *Initial law-enforcement investigation*

Officers responded to Appellant's house and observed Callison's body lying in Appellant and Hunt's bed. Callison was completely nude and had gunshot wounds to her right thigh, stomach, and head. The wound to Callison's thigh was a non-contact wound, meaning that the firearm was not in contact with her thigh when she was shot, but the wound had surrounding powder burns that indicated that Callison was less than six inches away from the firearm when she was shot. The round from the thigh wound went through Callison's leg, exited her thigh, and lodged in the soft tissue of her abdominal wall. Callison also had a gunshot wound to the right side of her head that appeared to have come from a firearm held between six and 30 inches away at the time it was fired. The wounds did not appear to be self-inflicted.

While searching the bedroom, officers located a purse in the bedroom that contained several condoms, Callison's driver's license, and a business card with the name "Paris," a phone number, and the Snapchat username "@parisangelpp" written on it. The officers also found a car key that opened the Mitsubishi parked in the driveway and two fired 9mm cartridge casings on the

2

bed. Officers searched the Mitsubishi and found a receipt for a hotel with Callison listed as the room occupant.

### (3) *Amber Merrill's testimony*

While at the scene, officers were approached by two women who told the officers that they recognized Callison's car. One of the women, Amber Merrill, testified that she was Callison's friend and roommate. Callison, Merrill, and the other woman, Tiffany Finstad, were "escorts" who would go on dates and engage in sexual acts in exchange for money. Callison and Merrill would post advertisements on various websites and used social media platforms like Snapchat to communicate with customers, with Callison going by the pseudonym "Paris." Merrill testified that she and Callison would use cell phone apps like "Sideline" to create a second phone number for use in their business. Callison, Merrill, and Finstad would share their work schedules for safety purposes and so they could be aware of each other's locations while working. Merrill also testified that there was very little likelihood that she or Callison would engage in sexual activity without being paid first and that it would have been out of character for Callison to do so. Merrill also stated that she could not recall an instance in which Callison had sex with a client without using a condom.

On January 31, 2019, Callison and Merrill travelled from Dallas to Austin to work in the escort business. On the early afternoon of February 1, 2019, Callison received a call for a two-hour "date" for which she would receive $600. Callison sent Merrill her location using her cell phone when she arrived at the work location in Bartlett, Texas, which concerned Merrill because it was approximately 55 minutes away, a farther distance than normal. Merrill opined that Callison and the potential customer would have had to have had a clear agreement for Callison to drive that long of a distance. About an hour after Callison texted Merrill that she had arrived at the Bartlett location, Merrill repeatedly attempted to contact Callison on her cell phone but was unsuccessful

3

in getting a response. Merrill drove out to the location Callison had sent. When she arrived, an ambulance and police officers were outside the house. At trial, Merrill testified that she recognized various items collected from Appellant's bedroom as belonging to Callison.

### (4) *Subsequent law-enforcement investigation*

Sergeant John Pokorny of the Williamson County Sheriff's Office was assigned to investigate Callison's death. After interviewing Merrill and Finstad, Pokorny began reviewing Callison's social media accounts. Pokorny also spoke to Hunt and learned that Appellant was missing and not answering calls on his cell phone. Pokorny had cell phone providers "ping" Appellant's and Callison's cell phones, which yielded only a general geographic location of the phones. Pokorny also requested OnStar, a GPS locator service for vehicles, to give a location of Appellant's truck, which was at that time present at a "very rural" location in Burnet County approximately 42 minutes away. A police helicopter located a truck parked in the middle of a field at OnStar's reported location. A police drone overflew the vehicle and found Appellant sitting in the front seat of his truck. At approximately 4:00 or 5:00 a.m. the next morning, a SWAT team surrounded the truck and ordered Appellant to exit the vehicle. Appellant complied and was detained. Officers found Appellant's cell phone in the truck and a loaded Smith and Wesson 9mm handgun on the truck's front passenger seat.

While at the scene, the lead detective in the investigation, Chad Skaggs, began questioning Appellant. Appellant stated that he "drank a lot of beer" at his house the previous morning and a "girl [he] had called out" from "Adult Search," an escort website, was at the house with him. The woman went by the name "Paris." After she arrived at the house at approximately 1:00 p.m., they spoke for "a little bit" and had sex. When officers asked why Callison had been shot, Appellant stated that she "tried changing her price at the last second" by raising the price from $600 to $1,000 after they had sex. Callison then began "screaming" and telling Appellant that she was going to

4

"call the cops on him if [he did not] pay her," and then Appellant "freaked out," pulled out his gun and shot her first in the leg and then in an unknown place while Callison was on the bed. Appellant used a Smith and Wesson 5906 9mm handgun he kept loaded in the dresser to shoot Callison. According to Appellant, Callison did not assault Appellant during the incident.

A review of Appellant's Snapchat messages showed that Appellant, with the username "pootangmaster," spoke to Callison through her "parisangelpp" account and gave his true name and home address on West Jackson Street in Bartlett. Prior to arriving at Appellant's house, Callison asked if Appellant had "600 roses" (i.e., $600), and Appellant said "no."

An autopsy report showed Callison's cause of death was gunshot wounds and her manner of death was homicide. The medical examiner found no evidence that Callison had been assaulted or was involved in a physical struggle prior to her death. The medical examiner performed a sexual-assault examination of Callison and took various DNA samples, including vaginal samples that, when tested, showed the presence of (1) an unusually high amount of sperm that would not be consistent with the use of a condom unless the condom broke; (2) DNA from Callison; and (3) a DNA mix that was 12.9 quintillion times more likely to have come from Callison and Appellant than Callison and one unrelated, unknown individual. No other DNA profiles were found through sample testing. Testing of the handgun seized from Appellant's truck showed that it had ejected the casings found at the murder scene and had fired the projectiles recovered from Callison's body.

### B. Procedural history

The State of Texas charged Appellant with one count of murder, alleging (1) Appellant intentionally and knowingly caused Callison's death by shooting her with a firearm; and (2) Appellant, with intent to cause serious bodily injury to Callison, committed an act clearly dangerous to human life by shooting her with a firearm that caused her death. The State also alleged that Appellant used a deadly weapon (a firearm) during the commission of the offense. Appellant

5

did not testify at trial and did not present evidence during the guilt-innocence phase of trial. The jury found Appellant guilty of murder and made an affirmative deadly-weapon finding. During the punishment phase of trial, Appellant requested a jury instruction on the issue of sudden passion, and the trial court charged the jury on that issue. The jury made a negative sudden-passion finding and assessed punishment of life in prison. This appeal followed.

## II. DISCUSSION

In his first issue on appeal, Appellant argues the evidence was legally insufficient to support the jury's rejection of his sudden-passion claim. In his second issue, Appellant argues the evidence is factually insufficient to support the jury's rejection of his claim.

### A  Standard of review

For elements of a criminal offense where the State has the burden of proof beyond a reasonable doubt, we review sufficiency of the evidence under the *Jackson v. Virginia* standard. *See Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). However, for matters in which the defendant bears the burden of proof by a preponderance of the evidence—such as the sudden-passion claim Appellant raised at punishment—we employ the civil standards of review for legal and factual sufficiency of the evidence. *See Rankin v. State*, 617 S.W.3d 169, 184–85 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd); *Gonzales v. State*, No. 11-17-00245-CR, 2019 WL 3727509, at *1-2 (Tex. App.— Eastland Aug. 8, 2019, pet. ref'd) (mem. op., not designated for publication); *see also Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013) (recognizing that a factual- sufficiency review applies to issues where the burden of proof is by a preponderance of the evidence because that standard is the same used in various civil proceedings).

As applied to a sudden-passion claim, we review the evidence for legal sufficiency by examining the record for any evidence that supports the jury's finding while ignoring all evidence to the contrary unless a fact finder could not. *Matlock*, 392 S.W.3d at 669; *Rankin*, 617 S.W.3d at 185. If no evidence supports the jury's finding, we review the entire record to determine whether the evidence establishes the opposite as a matter of law. *Matlock*, 392 S.W.3d at 668; *Rankin*, 617 S.W.3d at 185.

We review the evidence for factual sufficiency to support the jury's finding by examining all of the evidence in a neutral light to determine whether the verdict is "so against the great weight and preponderance of that evidence to be manifestly unjust." *See Matlock*, 392 S.W.3d at 672–73 (citation omitted); *Rankin*, 617 S.W.3d at 185–86; *see also Meraz v. State*, 785 S.W.2d 146, 154– 55 (Tex. Crim. App. 1990) (en banc) (setting forth this standard). We may only sustain a factual-sufficiency challenge "if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *See Matlock*, 392 S.W.3d at 671.

In reviewing both legal and factual sufficiency of the evidence, we must defer to the jury's role as sole judge of the weight and credibility of the evidence and recognize that the jury is free to accept or reject a defendant's version of the events supporting his sudden-passion claim. *See Rankin*, 617 S.W.3d at 185; *Gonzales*, 2019 WL 3727509, at *2.

### B. Applicable law

Murder is normally a felony offense of the first degree. TEX. PENAL CODE ANN. § 19.02(c). However, § 19.02(d) of the Texas Penal Code allows a defendant to raise the issue of sudden passion in the punishment phase of a trial for murder. *See id.* § 19.02(d). In particular, § 19.02(d) provides:

> At the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree.

*Id*. "Adequate cause" means a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). "Sudden passion" means "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). The defendant has the burden of production and persuasion to prove sudden passion.[2] *Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013).

### C. The evidence is legally sufficient to support the jury's negative sudden-passion finding

On appeal, Appellant claims "Callison's threat of police intervention, which could result in criminal charges and have a devastating effect on his already troubled marriage, provided adequate cause to produce a degree of terror, anger, rage or resentment that rendered Appellant's mind incapable of cool reflection." In support of his theory, Appellant points to his statement to police that he "freaked out" and shot Callison when she threatened to call the police on him. Appellant posits that his quick access to the handgun stored in his nightstand in a moment of passion is evidence that he lacked time for cool reflection. He also claims the evidence suggesting that he did not and could not pay Callison for sex undermined the State's theory that Appellant

---

[2] Appellant argues "[n]o evidence was presented to disprove Appellant's claim of sudden passion or [to] support the jury's negative finding." To the extent Appellant suggests the State had the burden to disprove his sudden-passion claim, we reject that argument because it was Appellant's burden of production and persuasion to prove sudden passion not the State's burden to disprove that issue. *See Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013); *Bradshaw v. State*, 244 S.W.3d 490, 502 (Tex. App.—Texarkana 2007, pet. ref'd) ("The State [is] not required to negate the existence of sudden passion; the [defendant] ha[s] the burden of proving it by a preponderance of the evidence.").

never planned to pay Callison and shot her when she complained about not being paid the purportedly correct amount. Instead, it was the threat to involve the police and be charged with a crime that was the adequate-cause catalyst for his sudden passion. The State responds that the argument between Callison and Appellant where she threatened to call the police would not be sufficient to constitute an adequate cause giving rise to sudden passion.[3]

Assuming Appellant's version of the events is true, we cannot say that Appellant's pre-existing marital problems and Callison's verbal argument with Appellant where she threatened to call the police if she was not paid more constitute an adequate cause giving rise to sudden passion, especially given that Callison did not physically assault Appellant during their argument. The jury could have concluded that Callison's demanding more money, "yelling," and threatening to contact police would have produced an "ordinary" level of anger or fear in a reasonable person, but Callison's actions would not constitute sufficient provocation to drive a person of ordinary temper to a violent passion or make such a person incapable of cool reflection. *See* TEX. PENAL CODE ANN. § 19.02(a)(1). The anger, rage, or terror of a person of ordinary temper under these circumstances would not have sent the person into a violent passion in which he would lose the ability to reflect on his actions.

For these reasons, the jury could have found that adequate cause giving rise to sudden passion did not exist. *See McKinney v. State*, 179 S.W.3d 565, 570 (Tex. Crim. App. 2005) ("yell[ing]" and "verbal taunting and physical pushing" are insufficient to constitute adequate cause justifying the issuance of a jury instruction on sudden passion); *McClinton v. State*, No. 01- 20-00779-CR, 2021 WL 4156012, at *4 (Tex. App.—Houston [1st Dist.] Sept. 14, 2021, no

---

[3] Pointing to evidence that before she came to his house, Appellant told Callison he did not have the money to pay her coupled with the unusually high amount of sperm found in Callison's body, the State also argues that the evidence supports the theory that Appellant never intended to pay Callison and instead sexually assaulted her then intentionally killed her. However, we need not address this contention because as we explain below, the evidence is legally and factually sufficient to support the jury's negative sudden-passion finding for lack of an adequate cause.

pet.) (mem. op., not designated for publication) ("A verbal confrontation, without more, cannot support a finding of sudden passion because insulting language does not rise to the level of adequate cause."); *Castellano v. State*, No. 01-14-00486-CR, 2015 WL 3981807, at *3 (Tex. App.—Houston [1st Dist.] June 30, 2015, no pet.) (mem. op., not designated for publication) (legally sufficient evidence supported jury's rejection of sudden passion where the defendant had past arguments with the victim, had previously been assaulted by the victim, and "lost it" in an argument that led to the defendant killing the victim); *Bradshaw v. State*, 244 S.W.3d 490, 503 (Tex. App.—Texarkana 2007, pet. ref'd) (even taking the defendant's claim that he was overwhelmed by learning of his estranged wife's infidelity as true, the jury could have concluded that such an event was not an adequate cause giving rise to sudden passion); *Gaston v. State*, 930 S.W.2d 222, 226 (Tex. App.—Austin 1996, no writ) (a wife's "nagging, taunting, and promising a divorce and property squabble" were not adequate causes giving rise to sudden passion that justified a sudden-passion jury instruction).

Moreover, Appellant's mere claim of fear from being reported to the police is insufficient to rise to the level of sudden passion, and the record does not contain evidence that Appellant was incapable of cool reflection when he "freaked out" and shot Callison after being threatened with a potential law-enforcement investigation. *See Gonzales v. State*, 717 S.W.2d 355, 357 (Tex. Crim. App. 1986) ("[A] mere claim of fear . . . does not establish the existence of sudden passion arising from an adequate cause. For a claim of fear to rise to the level of sudden passion, the defendant's mind must be rendered incapable of cool reflection.").

Because there is some evidence supporting the jury's rejection of Appellant's sudden-passion claim, we need not determine whether Appellant established his claim as a matter of law. *See Matlock*, 392 S.W.3d at 669. We conclude that legally sufficient evidence supports the jury's negative finding of sudden passion and overrule Appellant's first issue.

**D. The evidence is factually sufficient to support the jury's negative sudden-passion finding**

Regarding factual sufficiency, "we review all the evidence in a neutral light to determine if the contrary evidence greatly outweighs the evidence that supports the jury's determination." *Gonzales*, 2019 WL 3727509, at *3 (citing *Matlock*, 392 S.W.3d at 671). Appellant did not testify at trial. Other than evidence of his preexisting marital problems and his statement to officers that he "freaked out" and shot Callison after she demanded more money and threatened to involve the police, the record contains no other direct evidence of his state of mind when he shot Callison. In his briefing, Appellant reiterates his position in his first issue, calls our attention to his honesty during the police investigation, and argues that even if he "was under the impression he could have sex with Callison without paying, this does not address the issue of sudden passion." Appellant explains that "Appellant shot and killed Stormie Callison during an immediate moment of sudden passion that was directly caused by, and arose out of, provocation by Callison."

Viewing all the evidence in a neutral light and assuming that Appellant's version of events is true, Appellant's assertion that his marital issues and Callison's demand for more money and threat to call the police constituted adequate cause giving rise to sudden passion must fail for the same reasons enumerated above. The jury was free to reject Appellant's argument that he was so emotionally overwhelmed by Callison's demand for more money and threat to call the police that he was incapable of cool reflection, thus justifying the jury's implied finding that Appellant's actions were not supported by adequate cause giving rise to sudden passion. Giving appropriate deference to the jury's role as fact finder, its negative sudden-passion finding is not so "against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *See Matlock*, 392 S.W.3d at 671; *see also McClinton*, 2021 WL 4156012, at *5–6 (factually sufficient evidence supported jury's negative sudden-passion finding where the evidence showed

11

a strictly verbal confrontation between the defendant and the victim before the defendant shot the victim). Thus, we conclude that factually sufficient evidence supports the jury's negative finding of sudden passion and overrule Appellant's second issue.

## III. CONCLUSION

We affirm the judgment supporting Appellant's conviction.


LISA J. SOTO, Justice


May 31, 2023

Before Rodriguez, C.J., Soto, J., Marion, C.J. (Ret.)
Marion, C.J. (Ret.) (sitting by assignment)

(Do Not Publish)