# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00104-CR

**Roberto Gonzalez a/k/a Ruperto Gonzalez, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 421ST DISTRICT COURT OF CALDWELL COUNTY
### NO. 18-081, THE HONORABLE CHRIS SCHNEIDER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Roberto Gonzalez a/k/a Ruperto Gonzalez entered an open guilty plea to murder and, following a hearing on punishment, was sentenced by a jury to sixty years' confinement. *See* Tex. Penal Code § 19.02. In three issues, appellant contends that (1) the trial court erred by admitting a video recording of his police interrogation; (2) the trial court erred by submitting the issue of punishment to the jury; and (3) the evidence was legally and factually insufficient to support the jury's negative finding on sudden passion. We will affirm the trial court's judgment of conviction.

## BACKGROUND

Appellant was charged by indictment with the murder of his mother-in-law, Edna Juarez. The trial court granted his Motion Electing to Have the Jury Assess Punishment, and after entering appellant's open guilty plea, submitted the issue of punishment to the jury.

During the sentencing hearing, the State presented testimony from Anna Juarez, appellant's wife and Edna's daughter; Leticia Juarez, Anna's sister; Crystal Salazar, Anna's friend; former Lockhart Police Department (LPD) Officer Emmanuel Lindesay; LPD Lieutenant Jesse Bell; LPD Officer Steven Parra; and Dr. Susanna Dana, a forensic pathologist. Its exhibits included a recording of the 911 call; photographs of the crime scene, including the exterior and interior of appellant's home; video from officers' patrol cars; photographs of appellant; postmortem photographs of Edna; and a video recording of appellant's police interrogation. The defense presented appellant's testimony.

Leticia testified about the family's composition and history. Her mother, Edna, was 63 at the time of her death. She was partially blind, suffered from diabetes, was on dialysis, and had undergone foot surgery. She was also largely confined to a wheelchair and could only walk using a walker or if someone was holding her hand. In late January or early February 2018, Edna, Leticia, and Edna's son Angel had been homeless "off-and-on for about a year" but would stay "off-and-on" with Anna and appellant, at their invitation, at the couple's home in Lockhart. Appellant had moved from Florida to live with Anna, who was in love with him. After approximately three years of dating, they married. Appellant and Edna paid for the family's expenses, and appellant would accompany Anna when she took Edna to and from her dialysis appointments.

Leticia also testified about the events preceding Edna's death. On January 28, 2018, Leticia and Anna met two brothers at a bar, and the two pairs of siblings began dating. Anna "didn't want to be with [appellant any]more" and would go to the brothers' house "from time to time." On February 4, 2018, she and Leticia were in Austin with the brothers when Anna began experiencing stomach pain. Leticia took her to the hospital, where Anna remained for about a

2

week.  Appellant slept in her hospital room for the first two nights, but, when Anna was released, Leticia and Edna picked her up and dropped her off at a city park near her home.  When appellant asked about Anna, Leticia did not tell him that she had been released.  After Leticia dropped Edna off, she picked up Anna from the park, and they went to the brothers' house in appellant and Anna's one working vehicle.  Leticia and Anna had asked Edna to come with them, but she had refused.

The next day, February 10, 2018, Edna called Leticia around noon to ask where Anna was and explained that she had called Anna but had been unable to reach her.  Edna called Leticia approximately three more times over the next hour and a half, each time asking for Anna's whereabouts.  Edna had called from appellant's phone and had sounded concerned but not panicked.  Around 1:30 p.m., the last time Leticia and Edna spoke, appellant also began calling Leticia, who had blocked his number, and leaving voicemails.  After she listened to the messages at approximately 8 p.m., she called 911.  She had not thought that appellant "was going to do anything to [her] mother" and that he was "just threatening a lot."

Anna testified about her relationship with appellant.  He learned about her through a friend of hers in North Carolina, and they began to speak on the phone regularly.  After two or three months, appellant visited her in Texas and decided to stay.  Although appellant is approximately 30 years older than her, they dated for around three years and married in November 2016.[1]  They moved into their Lockhart home in 2017, and Edna came to live with them after Christmas.  Leticia and Angel moved in two weeks later.

---

[1] She testified that they were married in "November of – I think it was 2016."  Appellant later testified that they were married in November 2017.

3

In late January and early February 2018, Anna and appellant's marriage was "not happy." She was talking to him about leaving, and he would "tell [her] that [she] was his property and that [she] couldn't leave and just blow [her] off, ignore [her] after." He did not know that she had begun an extramarital relationship, though in the weeks before Edna's death, she would go back and forth between her home and her boyfriend's "[s]ome days" and stay "for a little while" before returning home. Edna and Leticia knew about the relationship.

Like Leticia, Anna also testified about the events leading up to Edna's death. On Sunday, February 4, 2018, Anna went to the hospital but did not tell appellant, who only learned that she had been admitted from Leticia. Appellant spent the next two nights in Anna's hospital room. On Tuesday, Leticia drove appellant to work, and Anna told hospital staff that she did not want appellant to return. She testified that she had not wanted him there because the night before he had been "acting weird and trying to take [her] car and stuff. And [she] didn't want him there like that." He called her cell phone, but she did not answer because she did not want him to know whether she was still in the hospital.

She was released on February 9th but did not tell appellant.[2] Leticia drove her home while he was at work. After a nap, Anna packed her things, and she and Leticia took Edna to a dialysis appointment. On the way back, Anna had Leticia drop her off at the park so that appellant would not know that she had left the hospital. Anna and Leticia had planned to rent a hotel room in Austin, but when Edna decided not to go, they went to the brothers' house instead. Edna knew where they intended to go and was "okay with that situation." Anna did "not really"

---

[2] Anna's testimony differs from Leticia's in several respects as to what happened following her release from the hospital.

hear from appellant that night: "it was just maybe a phone call or two," which she did not answer.

On Saturday morning, she had breakfast with her boyfriend. She was "not talking to [appellant] at that point," but he continued to call her throughout the day. At some point, she blocked his number "[b]ecause he was calling so much." He left voicemails, but she did not listen to them. When her friend Crystal texted her, however, she called appellant, who asked her where she was and what she was doing. She did not tell him because she was scared, and he "would be calm one second then he would be angry." He called her four or five times, and each time she hung up on him.

During appellant's last call, he told her, "Don't hang up . . . I'm going to pass you to your mom so you can talk to her. You know, she's here." Anna spoke with Edna, who was "[w]eird" and "quiet." Edna was also trying to whisper and "didn't want to speak too loud." When she handed the phone back to appellant, he told Anna that she needed to go home. The last thing she remembered hearing was Edna screaming, "No, Pelon.[3] It's not my fault."

Leticia called the police, and Anna listened to the voicemails left by appellant. In some, he stated that he loved her and asked her to come back home. In others, he was "more aggressive" and stated that she "needed to get home to feed him."

On cross-examination, she testified that Edna had called her a few times on Saturday, but she had not answered because "[Edna] was just calling [her] to probably tell her to go home and [she] just—[she] didn't want to go home." She also testified that in "the first [voicemails]" that Edna left her, she did not sound scared. She testified that Edna "got along with [appellant] okay for [her], but she didn't like him" and that appellant "[s]ometimes" "cared

---

[3] Appellant later testified that "Pelon" is his nickname.

5

a lot for [her] mother." She testified that some of the voicemails that appellant left concerned his need for a ride to pick up his paycheck so that he could pay the rent and that she had known that he had to work on Saturday. She testified that she had told appellant's sister that she was pregnant, that she knew her boyfriend was the father, and that she ended up not being pregnant.[4]

Crystal testified that appellant and Anna had lived with her for two or three months in 2017 and that she had paid Anna to watch her children. She testified that on February 10, 2018, appellant called her repeatedly, that she did not answer because she did not recognize the number, and that he left approximately six voicemails asking where Anna was. She testified that in one, appellant stated that "if [Crystal] didn't want any problems with him for [her] to tell him where [Anna] was at." She testified that she listened to the messages around 7:30 or 8 p.m., that she called Anna, and that she told Anna that appellant was looking for her. She also testified that she was concerned "because he kept calling [her] and calling [her] and calling [her]. Like [he was] really, really mad." She testified that Anna had told her that she and appellant were having problems but that she and Anna did not talk about Anna's relationship.

Ofc. Lindesay testified that he arrived at appellant's home around 10:30 p.m. on February 10, 2018, in response to a call for a welfare check; that a second officer arrived a few seconds later; and that they knocked on the home's rear door and kitchen window. He testified that, while they were knocking, a sergeant arrived, and "they decided to force entry in the rear door," which was blocked by a kitchen table. He testified that the officers announced themselves, that appellant came out of a bedroom wearing a jacket and hoodie, that there

---

[4] The date of this conversation was not given, nor did Anna testify that appellant was aware of the conversation.

appeared to be blood on his hands and jacket, that he turned to go back into the room when they called to him, and that they detained him in handcuffs in the hallway.

He also testified that when officers found Edna in the bedroom, there was a large kitchen knife embedded in the left side of her neck, that she was breathing very faintly and was "not really responsive," and that there also appeared to be a couple of lacerations to her arms. He testified that appellant seemed to be concerned about the money in his pocket and a loose dog; that he "seemed to be calm and not real interested in what's going on as far as the victim"; that he did not ask about Edna while at the scene; that while being transported to the hospital and jail, he was "basically calm" and "actually fell asleep a couple of times"; and that he asked about Edna for the first time during the police interrogation. On cross-examination, he testified that officers arrived at the home within 7 or 8 minutes of the 911 call, that he did not think that appellant was under the influence of narcotics, and that while at the police station appellant twice asked if Edna was alive.

Lt. Jesse Bell testified that he arrived at appellant's home shortly before midnight; that he made a diagram of the scene; and that he contacted "one of [their] Spanish[-]speaking officers at the police department[,] Officer Steven Parra." He testified that, during the interrogation, appellant "[f]or the most part" had "a very calm nonchalant demeanor" but that "[t]here were a couple of moments that he appeared to . . . be angry." He testified that he came up with the questions and that Ofc. Parra translated both the questions and appellant's answers.

On cross-examination, he testified that Ofc. Parra is fluent in Spanish, is not a certified translator, and was not "doing a word for word interpretation" but rather "a summary." He also testified that he did not observe any indications of intoxication on appellant "except maybe bloodshot eyes."

7

Following Lt. Bell's testimony, an evidentiary hearing was held outside the presence of the jury on appellant's "Motion to Exclude Translation Not Timely Served and Prohibit Simultaneous Translation," at which Ofc. Parra testified about his qualifications and experience and background as a Spanish speaker. He testified that he had spoken Spanish "[p]retty much [his] whole life," that Spanish was spoken in his home, that he is able to speak and write Spanish, that he took Spanish classes in high school and as part of his police licensing process, that he translates for the LPD two to four times a month, that he is "[f]or the most part" comfortable translating Spanish to English, and that he speaks a "TexMex type" of Spanish, which is what he encounters in his day-to-day activities.

He also testified about his interpretation during appellant's interrogation, explaining that he read appellant the *Miranda* warnings in Spanish from a card, that he tried to translate word-for-word, that it ended up being "more of a summary," that he was able to "communicate effectively" with appellant, and that there were no "misunderstandings." On cross-examination, he testified that the Spanish classes that he had taken "could be described or classified as 'basic rudimentary Spanish,'" that he had never taken a test to be certified as a language speaker, and that the only in-court translations he had done had been in municipal court "on occasion." He also testified that translation is "supposed to be word for word," that he "probably" "didn't get all of the words in there," and that appellant helped him "clarify" some of the words in the *Miranda* warnings because he was "having some difficulty with the Spanish language." After argument by the parties, the trial court overruled appellant's objections to the accuracy and constitutional adequacy of the interpretation.

Ofc. Parra's trial testimony largely reiterated his testimony from the hearing. After the State offered video of appellant's interrogation into evidence, he renewed his

8

objections, but the trial court admitted the video. Similarly, when the State attempted to open the second computer file on which the video was stored, he once more objected to the summary nature of the interpretation, but the trial court again overruled his objection. Although Ofc. Parra at times testified broadly as to what was happening on the video, he did not provide in-court interpretation of what was said during the interrogation. On cross-examination, he testified that he had not translated word-for-word, that he had given summaries as best as he could, and that he could have left out some information.

On the video, Ofc. Parra can be heard telling another officer, "I just told [appellant] that I'm just going to do the best I could with Spanish." Ofc. Parra read appellant his *Miranda* rights, and appellant stated that he waived his rights[5] and was willing to talk. Appellant told Lt. Bell and Ofc. Parra that he had been calling Anna but that she had not returned his calls or messages until he called her friend, Crystal. He stated that when he spoke with Anna, he told her, while playing, that if she did not return home, he would kill her mom. He also stated that he had called Anna approximately 50 to 60 times and asked the officers for his phone in order to show them.

He stated that he had been in the house when police arrived and had heard them bang on the door and enter. He explained that he had been in the room with Edna and was trying to get in touch with Anna and that he remembered hitting Edna with the knife once in her face but could recall nothing else. He told the officers that he had taken Edna's phone from her so that she could not call the police, that he had been mad, that he had put the phone in his pocket, and that it had been seized when he arrived at the station. He also told them that he became

---

[5] In providing appellant's statements from the interrogation video, the Court uses Ofc. Parra's English translations.

angry when Anna said certain things to him, including calling him names, stating that there was someone she liked better than him, and telling him that she did not want to be with him. He stated that he told Anna that as a result of everything that she was saying, he was going to kill Edna, but he said that he could not believe what happened. He stated that he only remembered hitting Edna in the face with the knife, which he got from the kitchen, and that if Anna had not called him back and said those things, "nothing would have ever happened."

He explained that he and Anna had been having issues for about two weeks and that Crystal had been getting between him and Anna and telling her that she should be with a younger man and should use appellant for his money. He also explained that Crystal and Leticia had been fueling the fire for Anna to leave him but that "Edna did not make [him] mad."

Following the interrogation, Ofc. Parra assisted appellant in preparing a written statement. When asked by Lt. Bell if he could "write okay in Spanish," Ofc. Parra responded, "I can try."

Dr. Susanna Dana testified that she performed Edna's autopsy. She testified that there were "12 actual stab wounds" and that it was her opinion that Edna "died as a result of multiple stab wounds." On cross-examination, she testified that she observed nothing to indicate that Edna had been previously assaulted or abused.

Appellant testified about the history and nature of his relationship with Anna. He met her through a friend while working in Virginia. He and Anna talked for three or four months and stayed in touch when he moved to Florida. In May 2014, Edna asked him for money, and he sent the family $500. Shortly afterward, he moved to Texas, and Anna invited him to live with her and Edna in Edna's trailer. Edna never said anything about the age difference between him and Anna. After five or six months, he, Anna, Edna, Leticia, and Angel moved into a bigger

10

trailer, for which appellant paid the rent. He would give Anna his paycheck and did not have "a dollar in [his] pocket." The only vehicle used by the family was his.

When his boss failed to pay him, he and Anna were forced to move. They stayed with Crystal before moving into their home in Lockhart. Eventually, Anna told him that Edna was homeless, and, as it was cold, he supported Anna's suggestion to have Edna live with them. Leticia also moved into the home and shared a room with Edna. Neither Anna nor Leticia worked, and appellant paid for their expenses, including a car for Anna. Although he and Anna had "some arguments, some discussions like it happens with every couple," "everybody g[o]t along at th[e] house." In particular, he got along with Edna and would take her places, including to her dialysis appointments. He never called her his mother-in-law but rather "Mama" or "Ma."

Next, he testified about his and Anna's marital issues in the week before Edna's death. Before Anna and Leticia went to the party at which they met the brothers—around his and Anna's one-year anniversary—he had believed that he and Anna had "a happy marriage." The sisters told him that he could not come with them to the dance, and Anna lied and said that they were going to McDonald's. He noticed that she was taking too long and, when he called, she told him that she had gone to the dance instead. He sent her a text asking her to come home before it ended because "there can be accidents" and "too much traffic," but she replied in a message, "I don't give a fuck. I'll come back . . . whenever I want to come back."

She never returned home; instead, he later learned that she had been admitted to the hospital for "a strong infection." He called her "all [day] Sunday until about 3 [p.m.]," when Leticia told him that Anna was in the hospital and did not want to see him. Edna "step[ped] into the situation then and told Leticia: [']You know, he is her husband. He has to go see her.[']" When he went to the hospital, however, Anna took his car keys and became angry that Leticia

11

had given them to him.  He visited Anna again on Monday, but on Tuesday, she told him that if he came close to the hospital, the doctors would call the police.  He went home, cried, and asked himself why she did not want him to visit her.  Nevertheless, he "kept calling [Leticia] and [his] wife.  And [he] kept calling and calling and calling."

On Friday, he called Anna around midday, and she answered.  When he called her again at approximately 5:30 p.m., she told him that she "fe[lt] so tired."  It sounded as if she were falling asleep while talking, and the call suddenly cut off.  He tried to call her back repeatedly, but she did not answer.

On Saturday morning, he tried again unsuccessfully to reach Anna.  He needed to pick up his paycheck from work to pay the rent, which was due that day.  He would have "[p]ossibly" "los[t] the house" had he missed the payment.  Edna called Anna and Leticia and left a voicemail explaining the situation.

He called Anna "all day on Saturday."  He also called the hospital around noon and learned that she had been discharged the day before.  On learning that she had not told him of her release, he "couldn't breath[e].   [He]  wanted—felt like crying, scream[ing], run[ning] . . . [a] lot. [He] was just listening for the ring—the train to be coming by so [he] could run out and maybe run underneath it."  He called Anna "[a]ll the time all day long" and "sat there and sat there and cried."  When he called Crystal, Anna called him almost immediately, and "[s]he said stop bothering her.  And [']don't bother me, because I've got somebody else in your place.[']  And she claimed that she never told [him] that.  But [he] clearly remember[ed] that she said that . . . later when [they] spoke on the phone from the jail."

Anna's admission made him feel "[w]orse" because she had "kept telling him" that she loved him, would not cheat on him, and would never leave him.  After the phone call,

12

"[e]verything went like dark on [him]," and he only "start[ed] seeing something again" when handcuffed in the back of a patrol car.

On cross-examination, he testified that he did not know how he discussed Edna's death during the interrogation because he did not remember anything. He testified that he and Anna began having problems when Anna started caring for Crystal's children because he did not like that Anna and Crystal "kept whispering and having secrets between them" and "go[ing] off together." He also testified that he did not like Anna going out without him, that they had been a "loving couple all the time," that "[he'd] get home from work and she'd take [his] shoes off and everything," and that as long "as she was at the house," they "were doing good."

He testified that he was upset when Anna told him at the end of January 2018 that she wanted a divorce but that it did not make him mad. He testified that he had not understood, however, because in mid-January, she had told him that she loved him and did not want to leave him. He testified that he had told her that "if [she] ever ha[s] someone who is younger than [him] . . . and that [she] want[s] to live with just tell [him]. Don't just go off and do it." He testified that she told him that she wanted a separation around January 28th and that "she repeated it to [him] again and she added that she wanted a divorce."

He similarly testified that he did not know why she told him that doctors would call the police if he tried to visit the hospital. He testified that "[w]e could say that [her request for a divorce a few days earlier] was the reason. Or perhaps it was the pain that she claimed that she had," about which he believed she was lying. He testified that her warning did not "irritate" him and that he "[j]ust let it go," but that "it did bother [him]." Conversely, he also testified that they had argued at the hospital on Monday, that she had said that she hated him, that he went

13

outside and cried, and that he called her to apologize even though "she's the one who provoked it by going out to the dance."

He testified that when she did not answer his calls in the days following, he "didn't really feel angry" but "figured she's hiding something" from him. Despite her not answering, he testified that he was "at ease" because "as long as [he] could keep working [he] was quite relaxed." However, he testified elsewhere that he gets "aggravated and mad at her because she's not answering [his] phone calls." He testified that he called her at least once on Friday around noon.

Lastly, he testified once more in detail about his recollection of the day of Edna's death. He and Edna were the only ones at home. He called Anna four times from 5 to 7 a.m., "[e]very 15, 20, 30 minutes," and was mad that she was not answering his calls. At 11 a.m., he called the hospital and learned that she had been discharged the day before, which made him "even angrier." After calling the hospital, he spent the rest of the day outside crying. He started calling Anna every 10 to 20 minutes; by mid-afternoon she had not answered "[s]ome 30 to 40 calls," and he was getting "pretty aggravated." He also began drinking and had two beers around noon or 1 p.m.

In the afternoon, a neighbor gave him a ride to pick up his check. When the neighbor dropped him off around 7:30 to 8 p.m., he bought a case of beer, took it home, and drank four or five more beers. He also called a psychic, and they spoke "for a good little while" and prayed together. He imagined that Anna was "off doing something with Crystal." He left voicemails on Anna's phone and—when asked if he remembered telling police that he was joking around when he told her that he was going to kill Edna—testified that he "did tell the officer that [h]e was playing around," that he believed that he told them that he had threatened to

14

kill Edna, that he did not know if he remembered things from that night when talking with officers, and that he did not remember anything when talking to police because "[e]verything was dark for [him]." However, he also testified that "the light c[a]me on" when he was "sitting handcuffed in the patrol car"; that he "d[id] recall from that moment on"; but that he "do[es]n't really remember," "everything is dark to him," and he does not know "how it is that [he] . . . could have done that." He testified that he did not remember anything he told the officers and that "[his] memory went dark when Anna called [him]" after she said, "[D]on't bother me because I've got someone else in your place." He testified that he did not see Edna "[u]ntil late that night when [he] was told that [he] supposedly had done that stupid thing" but that "[h]e didn't go into the house at all."

The jury found appellant guilty of murder and during punishment found that he had not proven that he acted under the influence of sudden passion. It assessed his punishment at 60 years' confinement.

## DISCUSSION

### 1. Admission of Interrogation Video

In his first issue, appellant contends that the trial court erred "when it admitted a summarized translation of [his] statement by an unqualified police officer rather than a competent certified translator."[6] The substance of the issue is, however, multifarious: appellant argues that (1) Ofc. Parra was unqualified to interpret for appellant, (2) the interpretation was inaccurate, (3) the interpretation was not constitutionally adequate, (4) the video recording's admission violated Rule 1009 of the Texas Rules of Evidence, and (5) its admission also violated

---

[6] The "summarized translation" in question refers to Ofc. Parra's interpretation between Lt. Bell and appellant shown on the video recording of the police interrogation.

article 38.30 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. art. 38.30 (establishing procedure for appointment of interpreter on party's or court's motion); Tex. R. Evid. 1009 (governing admission of translations of foreign documents).

### A. Preservation

As a preliminary matter, we must determine which of appellant's subclaims were preserved for appellate review. Preservation of error is a systemic requirement on appeal. *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009) (citing *Haley v. State*, 173 S.W.3d 510, 515 (Tex. Crim. App. 2005)). If an issue has not been preserved for appeal, a court of appeals should not address the merits of that issue. *Id.* Ordinarily, a court of appeals should review preservation of error on its own motion. *Id.* at 532–33; *see Wood v. State*, 560 S.W.3d 162, 165 n.8 (Tex. Crim. App. 2018); *Darcy v. State*, 488 S.W.3d 325, 327–28 (Tex. Crim. App. 2016); *Blackshear v. State*, 385 S.W.3d 589, 590–91 (Tex. Crim. App. 2012); *Wilson v. State*, 311 S.W.3d 452, 473–74 (Tex. Crim. App. 2010).

To preserve a complaint for appellate review, there must be a timely, specific objection and a ruling by the trial court. Tex. R. App. P. 33.1(a). "To be timely, a complaint must be made as soon as the grounds for complaint [are] apparent or should be apparent." *Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim. App. 1999). To be sufficiently specific, an objection need not employ "hypertechnical or formalistic . . . words or phrases," *Golliday v. State*, 560 S.W.3d 664, 670 (Tex. Crim. App. 2018), nor "magic words," *Ford*, 305 S.W.3d at 533. Similarly, while references to a statute might "help to clarify an objection that might otherwise be general or obscure," "an objection is not defective merely because it does not cite"

a particular statute. *Laws v. State*, 640 S.W.3d 227, 229 (Tex. Crim. App. 2022) (quoting *Ford*, 305 S.W.3d at 533).

Rather, the party must "let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it." *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009); *see Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992). "This gives the trial judge and the opposing party an opportunity to correct the error." *Pena*, 285 S.W.3d at 464 (citing *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005)). Accordingly, a "general or imprecise objection may be sufficient to preserve error for appeal, but only if the legal basis for the objection is *obvious* to the court and to opposing counsel." *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006). "Usually, for a complaint to be obvious," there will "have been statements or actions on the record that clearly indicate what the judge and opposing counsel understood the argument to be." *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012).

The arguments raised by appellant at trial and in his pretrial motion to exclude, insomuch as they applied to the interrogation video's admissibility, were limited to challenging the accuracy and constitutional adequacy of Ofc. Parra's interpretation. Although the motion referred to "the admitted evidence,"[7] from context it is apparent that it concerned the written statement, not the video. In the motion, appellant alleged a violation of the notice requirement in Rule 1009(a)—pertaining to translations of foreign language documents—and asserted that simultaneous translation at trial would lead to inaccuracies. These arguments are inapposite to

---

[7] At the time of the pretrial motion's filing, no evidence had been admitted.

17

the interrogation video, which is not a written document[8] and which already includes an English translation. Thus, appellant's motion does not preserve error regarding the video's admission.

Similarly, defense counsel's objections at trial challenged only the constitutional adequacy of, and perceived inaccuracies in, Ofc. Parra's use of Spanish, both in translating between appellant and Lt. Bell and in drafting appellant's written statement. As counsel summarized, "It's whether the words that he is speaking, [appellant] is speaking, are going to be accurately and truly reflected and presented to the jurors. And they are not through a summary."

Elsewhere, he elaborated:

> [T]he question on appeal is not whether the best means of interpretation services were employed, but whether the services employed were constitutionally adequate. The translation must be accurate or true but need not be perfect.
>
> . . . .
>
> In my opinion, the translation may have been a summary of what was said, but it is not an interpretation. And that's what we're here to do. They need to interpret for the jurors, not summarize for them, not give them a synopsis of what happened, even though it may be accurate it is not a translation. And that's why we think that both the video and the statement should be excluded.
>
> . . . .
>
> [I]f the trier of fact is not getting the complete evidence, how are they going to make a proper decision if they're just given summaries of evidence? We're here for punishment, but we still have some rules of evidence and they should still be followed.

---

[8] *See Castrejon v. State*, 428 S.W.3d 179, 184 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("Rule 1009(a) applies when a party offers a written translation of a foreign language document.").

18

When the State offered the interrogation video into evidence, appellant likewise renewed his previous objections "to the translation that it is a summary and not a complete translation." And, re-urging his "motion to exclude this video" once more, he explained:

> At this point I think the court has had observation to see—had an opportunity to see that a lot of the words that are being said are not being translated. There's whole sentences that are just being summarized. He[] talks for a paragraph then he gives a one sentence summary of what was said.

Conversely, appellant did not contest—either in his pretrial motion or when objecting at trial—Ofc. Parra's qualifications or the interrogation video's admissibility under Rule 1009 or article 38.30. *See generally* Tex. R. Evid. 1009; Tex. Code Crim. Proc. art. 38.30. While defense counsel briefly stated during the evidentiary hearing that Ofc. Parra's "level of Spanish is not even quite enough to read the *Miranda* [warnings] properly," he neither directly called into question Ofc. Parra's experience nor used the term "qualification" in making his objections. Consequently, the record indicates that the trial court correctly understood that appellant was objecting only to the accuracy of Ofc. Parra's translation and not his qualifications. *See id.*; *Buchanan*, 207 S.W.3d at 775. Following counsel's argument, the trial judge asked, "My question is how prejudicial any inaccuracy could be when we're only talking about punishment?" Moreover, after counsel informed the trial court that appellant would testify, the judge continued, "Well, if he's going to testify he'll have the opportunity to say that's not what I—in the interview that's not what I said. That was not accurately translated by Officer Parra . . . . Okay. All right. I'm going to deny the motion."

As discussed above, Rule 1009 was invoked by appellant exclusively in addressing the admissibility of his written statement. Article 38.30 was not mentioned by either side, and neither appellant, the State, nor the trial court moved for an interpreter to be appointed

19

to translate Spanish statements made in the video. For these reasons, only appellant's issues pertaining to the accuracy and constitutional adequacy of Ofc. Parra's interpretation in the interrogation video were preserved for appellate review.

### B. Constitutional Adequacy

Appellant contends that Ofc. Parra's translation during the interrogation was constitutionally inadequate.

"Questions regarding the appointment and performance of translators are legal questions regarding rights guaranteed by the United States and Texas constitutions—rights ensuring that an individual defendant has a fair trial." *Garcia v. State*, 887 S.W.2d 862, 875 (Tex. Crim. App. 1994), *abrogated on other grounds by Hammock v. State*, 46 S.W.3d 889, 893 (Tex. Crim. App. 2001). If a defendant does not speak English well enough to understand the trial proceedings or communicate with counsel, fundamental fairness and due process of law require that an interpreter be provided to translate between English and the accused's own language. *Linton v. State*, 275 S.W.3d 493, 500 (Tex. Crim. App. 2009). The right to an interpreter is part of an accused's constitutional right to confrontation and a matter of due process. *Kan v. State*, 4 S.W.3d 38, 41 (Tex. App.—San Antonio 1999, pet. ref'd); *see* U.S. Const. amends. VI, XIV; Tex. Const. art. I, § 10. "The question on appeal is not whether the 'best' means of interpretive services were employed, but whether the services that were actually employed were constitutionally adequate such that the defendant could understand and participate in the proceedings." *Linton*, 275 S.W.3d at 501; *see Castrejon v. State*, 428 S.W.3d 179, 184 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *Peralta v. State*,

20

338 S.W.3d 598, 604 (Tex. App.—El Paso 2010, no pet.). While the translation need not be perfect, it must be "true or accurate." *Peralta*, 338 S.W.3d at 604.

Issues concerning the provision of interpretive services are "within the sound discretion of the trial court," *Linton*, 275 S.W.3d at 503, and are reviewed for an abuse of discretion, *Orellana v. State*, 381 S.W.3d 645, 657 (Tex. App.—San Antonio, pet. ref'd). Because translation involves "a variety of factors," including the defendant's knowledge of English and the complexity of the proceedings, the trial judge "must be given wide discretion." *Linton*, 275 S.W.3d at 502–03 (quoting *Valladares v. United States*, 871 F.2d 1564, 1566 (11th Cir. 1989)).

In raising the issue of constitutional adequacy at trial, defense counsel cited the standard of review section in our sister court's opinion in *Castrejon*, 428 S.W.3d at 184,[9] which in turn cited the Court of Criminal Appeals' opinion in *Linton*, *see* 275 S.W.3d at 500. The latter decision, however, acknowledges that the constitutional right to adequate interpretive services is a trial right designed to ensure that a defendant can understand and participate in the proceedings in a meaningful way. *See id.* at 500 & n.13. Appellant has not provided—nor has this Court found—authority endorsing a right to constitutionally adequate interpretation during a preindictment police interrogation.

Although appellant compares the present case to *Leal v. State*, 782 S.W.2d 844, 849–851 (Tex. Crim. App. 1989), and *State v. Andaverde*, No. 01-10-00697-CR, 2013 WL 3155929, at *3 n.7 (Tex. App.—Houston [1st Dist.] June 20, 2013, no pet.) (mem. op., not designated for publication), those cases do not recognize the constitutional right claimed by appellant. In *Leal*, the trial court admitted a tape recording of a mostly Spanish conversation,

---

[9] The *Castrejon* decision did not directly address the issue of constitutional adequacy.

and the jury listened to it while reading from an English transcript[10] prepared by an unidentified translator.  782 S.W.2d at 847 & n.4.  The Court of Criminal Appeals determined that the "safeguards of Art. 38.30 appl[ied]" and concluded that "the trial court erred when it admitted the tape recording into evidence without it being translated from Spanish to English by a sworn interpreter."  *Id.* at 849–50.  The Court also concluded that the trial court erred by using the unsworn translation to aid the jury.  *Id.*

In *Andaverde*, although the case involved the admissibility of a preindictment video recording of a police interrogation, the court of appeals likewise never considered a purported constitutional right.  Indeed, the court expressly acknowledged that "a review of the record reveals no mention by trial counsel of constitutional grounds supporting the suppression of [defendant]'s statements," and therefore it did "not address the State's arguments concerning hearsay or constitutional issues."  2013 WL 3155929, at *4 n.8.

Thus, because appellant has not established that he was entitled to constitutionally adequate interpretive services during his interrogation, we cannot conclude that the trial court's failure to exclude the interrogation video on that ground was an abuse of discretion.

## C.    Accuracy

Appellant also contends that the trial court erred in admitting the interrogation video because Ofc. Parra's translation was inaccurate and because he merely summarized instead of translating word-for-word.

A challenge to the accuracy of a translation is an issue of fact that must be settled by the trier of fact.  *Calixto v. State*, 66 S.W.3d 505, 510 (Tex. App.—Austin 2001, pet. ref'd)

---

[10] The transcript was published to the jury but was not admitted into evidence.

22

(citing *Garcia*, 887 S.W.2d at 875). Such an issue is not reviewable by this Court. *See Garcia*, 887 S.W.2d at 875 ("[W]e cannot even review the question, because there is no legal issue presented; it is a factual question which ultimately only the jury can answer, and which is not reviewable by this court."); *Martins v. State*, 52 S.W.3d 459, 471 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.) ("An attack on the accuracy of a translation, on the other hand, is a question of fact for the factfinder and so not reviewable on appeal."); *Kan*, 4 S.W.3d at 43 ("The accuracy of the translation was a fact question properly addressed to the trial court."). An appellate court can no more determine whether a translation is accurate or which of two translations is more accurate, than it can determine which of two witnesses is telling the truth, or which of the two is more truthful. *Garcia*, 887 S.W.2d at 875.

Accordingly, an appellant may not preserve error by objecting that a translation is inaccurate because "there is simply no reviewable question to preserve." *Id.*

For the foregoing reasons, we conclude that the trial court did not abuse its discretion in admitting the interrogation video. We therefore overrule appellant's first issue.

## 2. Jury-Assessed Punishment

In his second issue, appellant contends that the trial court erred by allowing the jury to sentence him without the jurisdiction to do so. Specifically, he argues that his sentence was illegal because he only pleaded guilty to the trial court, thereby causing the proceeding to become unitary.

It is well established that the constitutional right to a jury trial does not encompass the right to have the jury assess punishment. *Barrow v. State*, 207 S.W.3d 377, 380 (Tex. Crim. App. 2006); *see* U.S. Const. Amend. VI; Tex. Const. art. I, § 15. The right to jury-assessed

23

punishment in Texas is a statutory right, *Martin v. State*, 753 S.W.2d 384, 388–89 (Tex. Crim. App. 1988), which can be waived, *Vidaurri v. State*, 49 S.W.3d 880, 886 (Tex. Crim. App. 2001). In order to avoid forfeiture of a statutory right, a defendant must complain at trial or in a motion for new trial. *Bledsoe v. State*, No. 06-16-00044-CR, 2016 WL 5957038, at *2 (Tex. App.—Texarkana Oct. 14, 2016, no pet.) (mem. op., not designated for publication); *see Burt v. State*, 396 S.W.3d 574, 577 (Tex. Crim. App. 2013) ("A sentencing issue may be preserved by objecting at the punishment hearing, or when the sentence is pronounced."); *Mercado v. State*, 718 S.W.2d 291, 296 (Tex. Crim. App. 1986) ("As a general rule, an appellant may not assert error pertaining to his sentence or punishment where he failed to object or otherwise raise such error in the trial court."); *Prudhomme v. State*, 47 S.W.3d 683, 690 (Tex. App.—Texarkana 2001, pet. ref'd) ("Where a defendant elects at the beginning of trial to have the jury assess punishment, it is presumed that such defendant agreed at the end of trial for the court to assess punishment where . . . the court did so and no objection by either party appears in the record." (citing *Hackey v. State*, 500 S.W.2d 520, 521 (Tex. Crim. App. 1973))). *Cf.* Tex. Code Crim. Proc. art. 26.14 (requiring jury to assess punishment when defendant pleads guilty unless he waives that right).

Appellant filed a pretrial motion to have a jury assess his punishment, which was granted by the trial court. He entered a guilty plea before the court, and the following exchange occurred:

> THE COURT: All right. And there's no plea bargain so no further questions to ask. And we are—and you understand that by pleading guilty the jury will only be determining what your sentence is going to be in this cause?
>
> THE DEFENDANT: Yes.

Prior to voir dire, the trial judge similarly asked whether either party objected to the jury's assessing punishment:

> THE COURT: Okay. I intend to go ahead and tell [the panel] that the Defendant has entered a plea, explain to them a little bit about how the process work. That he already entered a plea and it's going to be a punishment only trial. Anybody have any objection to that?
>
> THE STATE: No.
>
> THE COURT: I mean, otherwise they're going to be going: What's going on?
>
> THE STATE: No. That's fine, Your Honor.
>
> THE COURT: Okay. Anything before we –
>
> THE DEFENSE: I can't think of anything.
>
> THE COURT: Okay.
>
> THE DEFENSE: Ready to rock and roll.

No objection was subsequently made to the jury's assessment of punishment.

Because the record shows that appellant elected to have the jury assess punishment, the jury did so, and neither party objected, the issue was waived and may not be raised for the first time on appeal. We overrule appellant's second issue.

25

**3.     Sufficiency of the Evidence**

In his third issue, appellant contends that the evidence was not legally or factually sufficient to support a negative finding by the jury on the issue of sudden passion.

Although the issue of sudden passion is a punishment issue, many courts of appeals—including this Court—have determined that it is analogous to an affirmative defense for sufficiency purposes because the defendant has the burden of proof by a preponderance of the evidence. *See Thompson v. State*, No. 12-19-00268-CR, 2021 WL 1418402, at *2 (Tex. App.—Tyler Apr. 14, 2021, pet. ref'd) (mem. op., not designated for publication); *Gonzales v. State*, No. 11-17-00245-CR, 2019 WL 3727509, at *1 (Tex. App.—Eastland Aug. 8, 2019, pet. ref'd) (mem. op., not designated for publication); *Ross v. State*, No. 05-18-00262-CR, 2019 WL 3543578, at *11 (Tex. App.—Dallas Aug. 5, 2019, no pet.) (mem. op., not designated for publication); *Wright v. State*, No. 04-16-00240-CR, 2017 WL 2561564, at *6 (Tex. App.—San Antonio June 14, 2017, no pet.) (mem. op., not designated for publication); *Jackman v. State*, No. 08-14-00176-CR, 2016 WL 4538533, at *7 (Tex. App.—El Paso Aug. 31, 2016, no pet.) (mem. op., not designated for publication); *Rodriguez-Olivas v. State*, No. 02-13-00520-CR, 2015 WL 6081773, at *19 (Tex. App.—Fort Worth Oct. 15, 2015, pet. ref'd) (mem. op., not designated for publication); *Hernandez v. State*, No. 03-14-00413-CR, 2015 WL 3858240, at *8 (Tex. App.—Austin June 16, 2015, no pet.) (mem. op., not designated for publication).  Thus, a finding on sudden passion may be evaluated for both legal and factual sufficiency, even after the Court of Criminal Appeals in *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010), abolished the factual-sufficiency standard as it applies to criminal convictions, *Ross*, 2019 WL 3543578, at *11 (citing *Gaona v. State*, 498 S.W.3d 706, 710–11 (Tex. App.—Dallas 2016, pet. ref'd)).

### A.    Legal Sufficiency

When reviewing the legal sufficiency of the evidence supporting an adverse finding on an affirmative defense, we first search the record for a scintilla of evidence favorable to the factfinder's finding and disregard all evidence to the contrary unless a reasonable factfinder could not. *Petetan v. State*, 622 S.W.3d 321, 337 (Tex. Crim. App. 2021); *Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015); *Matlock v. State*, 392 S.W.3d 662, 669 (Tex. Crim. App. 2013). "The factfinder may reasonably infer facts from the evidence before it, credit the witnesses if it cares to, disbelieve any or all of the testimony proffered, and weigh the evidence in the manner it chooses." *Ellis v. State*, 99 S.W.3d 783, 789–90 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (citing *Bruno v. State*, 922 S.W.2d 292, 293 (Tex. App.—Amarillo 1996, no pet.)). If we find "some evidence," we must reject the legal-sufficiency challenge. *Afzal v. State*, 559 S.W.3d 204, 208 (Tex. App.—Texarkana 2018, pet. ref'd). If, however, no evidence supports the finding, it "should be overturned for lack of legal sufficiency only if the appealing party establishes that the evidence conclusively proves his affirmative defense, and no reasonable factfinder was free to think otherwise." *Petetan*, 622 S.W.3d at 337; *see Matlock*, 392 S.W.3d at 670.

A person commits murder if he or she "intentionally or knowingly causes the death of an individual." Tex. Penal Code § 19.02(b)(1). During the punishment phase of trial, a defendant may raise the issue of "whether he caused the death under the immediate influence of sudden passion arising from an adequate cause." *Id.* § 19.02(d). If he or she proves the issue by a preponderance of the evidence, the offense changes from a first-degree to a second-degree felony. *Id.* § 19.02(c), (d). "'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render

27

the mind incapable of cool reflection." *Id.* § 19.01(a)(1). "'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.01(a)(2).

The issue of sudden passion is "essentially a culpable mental state," *Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998), which is generally inferred from acts, words, and the circumstances under which a prohibited act or omission occurs, *id.*; *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991). "Provocation by people other than the victim or one acting with her does not meet the definition of sudden passion." *Hernandez v. State*, 127 S.W.3d 206, 213 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

Likewise, neither "ordinary fear nor anger alone is sufficient to establish sudden passion." *De Leon v. State*, 373 S.W.3d 644, 650 (Tex. App.—San Antonio 2012, pet. ref'd); *see Gutierrez v. State*, 85 S.W.3d 446, 451 (Tex. App.—Austin 2002, pet. ref'd) ("[A]nger does not rise to the level of adequate cause." (citing *Naasz v. State*, 974 S.W.2d 418, 425 (Tex. App.—Dallas 1998, pet. ref'd))). In most cases, the issue is resolved exclusively by the factfinder's assessment of whether the witness is credible, and the factfinder may choose to believe all, some, or none of the testimony presented. *Perez v. State*, 323 S.W.3d 298, 306 (Tex. App.—Amarillo 2010, pet. ref'd). Whether a cause is adequate is determined by applying the "person of ordinary temper" standard, which is the same as the reasonable person standard. *Segovia v. State*, 467 S.W.3d 545, 557 (Tex. App.—San Antonio 2015, pet. ref'd) (quoting *Gonzales v. State*, 689 S.W.2d 900, 903 (Tex. Crim. App. 1985)).

The adequate provocation must also exert an *immediate* influence. *See Nance v. State*, 807 S.W.2d 855, 860 (Tex. App.—Corpus Christi–Edinburg 1991, pet. ref'd). Passion

resulting from former provocation is insufficient. *Id.* at 861. Where a defendant has had a period of fifteen minutes to an hour to cool off, courts have declined to overturn a jury's negative finding on sudden passion. *Pulido v. State*, No. 08-06-00229-CR, 2008 WL 3125832, at *7 (Tex. App.—El Paso Aug. 7, 2008, pet. dism'd, untimely filed) (mem. op., not designated for publication) (citing *White v. State*, 699 S.W.2d 607, 617 (Tex. App.—Dallas 1985, pet. ref'd) (ten or fifteen minutes); *Gaston v. State*, 930 S.W.2d 222, 226 (Tex. App.—Austin 1996, no pet.) (one hour)). Similarly, if it appears that a defendant acted "purposefully to achieve his stated intention," his conduct does not satisfy the definition of sudden passion. *Drousche v. State*, No. 03-96-00442-CR, 1997 WL 759638, at *3 (Tex. App.—Austin Dec. 11, 1997, pet. ref'd) (mem. op., not designated for publication). Evidence proving sudden passion may also be used to prove adequate cause. *Moore*, 969 S.W.2d at 11.

Evidence was presented at trial that Edna did not provoke appellant's purported sudden passion. On appeal, appellant asserts that his sudden passion was caused by his discovering that Anna and Edna had concealed Anna's affair, discharge from the hospital, and preparations to leave him. However, nothing in the record indicates that appellant was aware that Edna had known those things, and appellant consistently affirmed that he had not been angry with her at the time of her death.

During appellant's interrogation, he told officers that "Edna did not make [him] mad" and that she had been helping him try to get in touch with Anna. Rather, he stated that he got mad because Anna called him and insulted him, told him that she hated him and did not want to be with him, and revealed that there was someone that she liked better than him. He also stated that if Anna had not called him, "nothing would have happened"; that before the call, he

29

was "just talking with Edna"; and that he told Anna that, "because of all these things that [she was] telling [him]," she was "going to pay for this."

Appellant's trial testimony likewise supported a reasonable inference that he was not upset with Edna but instead wished to punish Anna. He got along well with Edna and called her "Mama" or "Ma." When Leticia told him that Anna was in the hospital and did not want to see him, Edna "did step into the situation then and told [her]: [']You know, he is her husband. He has to go see her.[']" Similarly, on the day of her death, Edna called Anna and Leticia and left voicemails explaining why appellant was angry and needed to be driven to work.

Everything went dark for him only when Anna told him to stop bothering her because she had "somebody else in [his] place." Significantly, in explaining why Anna's statements made him feel worse, he did not mention Edna:

> I felt [Anna]'s only been playing with me, toying with me. Because she kept— she kept telling me that. ["]You know, I'm never—I—I'm never going to cheat on you. I'm never going to leave you,["] because she would say I love you. ["]I love you a lot even if you're older than I am. But I don't mind the age. You love me. You take care of me.["] That's what she would tell me. ["]I'm never going to leave you.["]

Indeed, when asked if he knew why he killed Edna and if he liked her, he testified, "I liked her a lot. I loved the lady. I lost my mother and that was the reason why I called her mom." At no point did he testify that Edna had hidden Anna's betrayal from him, that she had betrayed him, or that he believed her to be complicit in Anna's affair.

Because there was more than a scintilla of evidence presented at trial that, if appellant was under the influence of sudden passion, it was not caused or provoked by Edna, we need not consider whether appellant proved the issue of sudden passion as a matter of law. *Moncivais v. State*, 425 S.W.3d 403, 408 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). We

30

conclude that the evidence was legally sufficient to support the jury's negative finding on the issue. *See Petetan*, 622 S.W.3d at 357; *Hernandez*, 127 S.W.3d at 213.

### B.    Factual Sufficiency

Finding that the evidence is legally sufficient "is the starting point for a factual sufficiency review." *Petetan*, 622 S.W.3d at 357. In a factual-sufficiency review of a finding rejecting an affirmative defense, we view the evidence in a neutral light rather than the light most favorable to the verdict. *Id.*; *Butcher*, 454 S.W.3d at 20 (citing *Matlock*, 392 S.W.3d at 670). However, we may not usurp the function of the factfinder by substituting our judgment in place of its assessment of the weight and credibility of testimony. *Petetan*, 622 S.W.3d at 357. We may sustain a factual-sufficiency challenge on appeal only if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, we clearly state "why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Id.*; *see Butcher*, 454 S.W.3d at 20; *Matlock*, 392 S.W.3d at 670. If we find that the evidence supporting the affirmative defense so greatly outweighs the State's contrary evidence that the verdict is manifestly unjust, we must reverse the trial court's judgment and remand the case for a new trial. *Petetan*, 622 S.W.3d at 357.

Appellant's argument focuses almost exclusively on the deterioration in his and Anna's relationship in the days preceding Edna's death. He provides a litany of Anna's perceived misdeeds: not telling him that she had been admitted into the hospital; prohibiting him from visiting her there; refusing to answer his calls; blocking his number; not telling him that she had been discharged; and telling him that she hated him, did not want to be with him, and was

31

with another man. He asserts that at the time he "stabbed the decedent in the face," he had "just learned that his wife and the decedent hid all this information from [him]" and that Edna "worked in conjunction with Anna to hide Anna's [extramarital] relationship," was with Anna when she packed her things to leave him, and "hid the fact that Anna had discharged from the hospital and was cheating on him." He also states that he "raged based on not being told his wife discharged from the hospital, not being able to communicate with his wife, and learning that she was sleeping elsewhere and cheating on him with somebody else."

First, as discussed above, the evidence presented at trial indicated that appellant was enraged not by Edna's silence or complicity but solely by Anna's call insulting him and admitting her infidelity. No evidence in the record shows that he was angry with Edna at the time of her death or even aware that she had known of Anna's affair. Likewise, to the extent that he argues that Anna's hospital stay, alleged dishonesty, uncommunicativeness, and call cumulatively amounted to an adequate cause, such an argument is also without merit. Nothing in the record shows that Edna caused these actions or acted in concert with Anna. While Anna and Leticia testified that Edna was aware of Anna's affair and while Anna testified that Edna was "okay" with the sisters' spending the night at their boyfriends' house on Saturday, Leticia testified that Edna did not want to accompany them and did not "want[] to be part of that," choosing instead to stay with appellant. Similarly, Anna testified that she did not answer Edna's calls on the day of her death because Edna often called her to tell her to come home.

Second, the jury could have reasonably determined that appellant was not under the influence of a sudden passion. In effect, appellant seems to argue that Anna's actions in the days before Edna's death caused him stress and anger which only precipitated into sudden passion following her call. At trial, however, he repeatedly equivocated about how Anna's prior

32

actions made him feel. He testified that he felt suicidal and angry when he learned that she had been discharged without telling him and that he was "upset" when she told him that she wanted a divorce in January. However, he also testified that he was not angry when she told him that she wanted to separate but was "easy" and "quiet"; that he "didn't really feel angry" when she ignored his calls; that he was "at ease" and "quite relaxed" as long as he could keep working; and that, while her threat to have the police called if he came to the hospital "did bother [him]," it did not "irritate" him and he "let it go." He testified that their argument at the hospital on Monday, in which she told him that she hated him, made him cry but added that he was only "bothered" "[a]t the moment."

Moreover, although he testified elsewhere that he was mad that Anna was not answering his calls, he then testified that it only made him "pretty aggravated" and that he did not get angry until she called him back. When asked to clarify if he really had not been angered by her ignoring 30 to 40 of his calls, he testified, "Well, you could say I was angry. But—but to be able to say that I was at that level of extreme anger, I wasn't. Because I kept imagining that she was off doing something with Crystal."

Accordingly, appellant seemingly contends that although Anna had previously asked for a divorce, told him that she hated him, threatened to call the police if he visited her in the hospital, lied about being discharged, lied about going to a party which she forbade him from attending, ignored dozens of his phone calls, and blocked his number, it was only when she called him a final time to insult him, reveal her affair, and tell him again that she hated him and did not want to be with him that his mind went dark, and he "raged." The jury could have chosen to believe those portions of appellant's testimony insisting that he had not been unduly angered by Anna's actions preceding the call and inferred that, given this history, the call alone

33

would not have been sufficient to "produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Tex. Penal Code § 19.02(a)(1).

Such an inference by the jury is also supported by Ofc. Lindesay's testimony that, when appellant was arrested, he seemed to be concerned only about the money in his pocket and a loose dog; that he "seemed to be calm and not real interested in what's going on as far as the victim"; that he fell asleep while being transported to the hospital and jail; and that he did not ask about Edna at the scene. On the dash cam video, appellant appears mostly relaxed, and an officer can be heard stating, "He's chill. He said, 'We're going to jail? Not going to jail?' And I got a couple of 'fuck you's.'" And although appellant asked after Edna during the interrogation, Lt. Bell similarly testified that, "[f]or the most part, [he had] a very calm nonchalant demeanor. There were a couple of moments that he appeared to me to be angry, but they were, you know, kind of fleeting moments here and there." The jury could have reasonably inferred from appellant's calm at the time of his arrest that he had not been subject to a sudden passion during the murder.

Finally, the record contains evidence that appellant did not act under the *immediate* influence of a sudden passion. As noted above, where a defendant acts purposefully to achieve a stated intention, his conduct does not satisfy the definition of sudden passion. *Drousche*, 1997 WL 759638, at *3; *see McKinney v. State*, 179 S.W.3d 565, 570 (Tex. Crim. App. 2005) (concluding appellant was not entitled to sudden-passion instruction when "it appear[ed] that Appellant had time to consider how to deal with his son, and by retrieving his gun, he was preparing himself to respond to the altercation he was anticipating"); *Gonzales v. State*, 717 S.W.2d 355, 357 (Tex. Crim. App. 1986) (determining that appellant did not act

34

under immediate influence of sudden passion because he "anticipated the event and prepared himself to respond to the occasion[,] . . . demonstrating a person possessed of cool reflection throughout the entire incident"); *Hobson v. State*, 644 S.W.2d 473 (Tex. Crim. App. 1983) (holding that appellant's passion did not arise at time of offense where he had "emotional crisis," followed victim all day, confronted him, and stabbed him).

During appellant and Anna's final call on Saturday night, Anna testified that appellant told her not to hang up, stating, "I'm going to pass you to your mom so you can talk to her. You know, she's here." Edna was "quiet" and acting "[w]eird" like she "didn't want to speak too loud" or was trying to whisper. Leticia testified that although she had not thought appellant was going to do anything to Edna, he was "just threatening a lot." In his interrogation, appellant stated that he told Anna that he would kill Edna if Anna did not return home but that he had been "playing around" and was "kidding." He also told officers that he had gotten the knife used to stab Edna from the kitchen and had taken her phone so that she could not call the police. When police arrived at appellant's home, they discovered that he had blocked the rear door with the kitchen table.

From these facts, the jury could have reasonably inferred that appellant had not been under the immediate influence of a sudden passion but had prepared to kill Edna if Anna did not return home. Such threats, calculation, and planning are inconsistent with appellant's account that his rationality was overcome after Anna told him that she was having an affair.

Viewing all of the evidence in a neutral light, we cannot say that the evidence supporting the jury's negative finding on sudden passion was so against the great weight and preponderance of the evidence that the verdict was manifestly unjust. *See Petetan*, 622 S.W.3d at 357.

35

We overrule appellant's third issue.

## CONCLUSION

Having overruled each of appellant's issues, we affirm the trial court's judgment of conviction.

_____
Edward Smith, Justice

Before Justices Baker, Smith, and Theofanis

Affirmed

Filed:   June 8, 2023

Do Not Publish