**Arnold Ray GASTON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 03–95–00100–CR.**

Court of Appeals of Texas,
Austin.

Aug. 28, 1996.

Gaston was indicted for murder. His truck, which he drove to the church when he killed Valita, was forfeited before he came to trial on the indictment. In relation to this action, he filed a special plea of jeopardy, a motion to dismiss for double jeopardy, and an application for writ of habeas corpus. The trial court rejected these and proceeded to trial.

Gaston asserts four points of error. He contends that the trial court erred by not charging the jury on voluntary manslaughter and involuntary manslaughter, by admitting certain hearsay statements, and by rejecting his double-jeopardy claims in his writ of habeas corpus and special plea. We find no harmful error in any of these contentions.

### No Double Jeopardy

By point of error four, Gaston contends that the trial court erred by denying his application for a writ of habeas corpus and special plea of double jeopardy. He contends that the forfeiture placed him in jeopardy and thereby foreclosed the subsequent prosecution.

The framework of our discussion was altered greatly after briefing and oral argument by the United States Supreme Court's opinion in *United States v. Ursery*, —— U.S. ——, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996).[1] The Supreme Court held that property used to facilitate crimes could be civilly forfeited without causing jeopardy to attach; thus, prosecution and related forfeitures may occur without either creating a double-jeopardy bar to the other. *Id.* at ——————, 116 S.Ct. at 2149–50, 135 L.Ed.2d at 571. Though the Supreme Court did not explicitly overrule any decision of this Court, its interpretation of its precedent in *Ursery* differs greatly from the understanding of that same precedent this Court expressed in *Ex parte Ariza*, 913 S.W.2d 215 (Tex.App.—Austin 1995, pet. filed). *Compare id. with Ursery*, —— U.S. ——, 116 S.Ct. 2135, 135 L.Ed.2d 549. These differences require us to reexamine the Texas forfeiture statute (Tex.Code Crim. Proc. Ann. arts. 59.01–59.11 (West Supp.1996)) and our holding that forfeitures thereunder were punitive and created jeopar-

Christine Byrd Webb, Burnet, for appellant.

Sam Oatman, District Attorney, John Morgan Minton, Assistant District Attorney, Llano, for appellee.

Before POWERS, JONES and B.A. SMITH, JJ.

PER CURIAM.

Arnold Ray Gaston was convicted of murdering his wife, Valita Gaston, and sentenced to thirty-five years' imprisonment and a $10,-000 fine. We will affirm the judgment.

There is no dispute that the eighty-year-old Gaston got his gun, drove to the Calvary Hills Church in Kingsland, walked calmly into the fellowship hall, spoke briefly, pointed the gun at Valita's head, and shot her to death. He tried to shoot others, but the gun failed to fire.

---

1. All pinpoint cites will be to Lawyers Edition, 2d.

dy that barred subsequent prosecutions for the underlying offense. *See Ariza,* 913 S.W.2d at 222–23.

In *Ursery,* the Supreme Court decided two cases. In one case, the United States settled a forfeiture action against a house that contained marijuana residue and a grow light, then prosecuted the settlor for marijuana production. *Id.* at ——–——, 116 S.Ct. at 2138–39, 135 L.Ed.2d at 557. In the second case, the United States obtained convictions of two men for conspiracy to launder money and to aid and abet the manufacture of methamphetamine, then obtained forfeiture of various items used to facilitate those offenses. *Id.* at ——, 116 S.Ct. at 2139, 135 L.Ed.2d at 557–58. In both cases, the appellate courts held that the second actions (criminal prosecution in the first case, forfeiture in the second) violated the constitutional protection against double jeopardy. *See* U.S. Const. amend. 5. The Supreme Court reversed both appellate court decisions, holding that the forfeitures were neither punishment nor criminal for the purposes of the double jeopardy analysis. *Ursery,* —— U.S. at ——, 116 S.Ct. at 2149, 135 L.Ed.2d at 571.

■ The Supreme Court outlined a two-part test for whether jeopardy attached during a forfeiture proceeding. *Id.* at ——, 116 S.Ct. at 2147, 135 L.Ed.2d at 568. If civil, we must first decide whether the legislature intended the forfeiture proceeding to be criminal or civil. *Id.* We must then decide whether the proceeding was so punitive in form and effect that the forfeiture proceeding was criminal despite the legislature's contrary intent. *Id.*

■ Part one requires objective analysis of the procedural mechanisms. *See id.* The Texas legislature intentionally cloaked the forfeiture proceeding in civil trappings despite placing the statute in the Code of Criminal Procedure. Service of process (with specific exceptions), pleading, and trial are conducted as in "other civil" cases. *See* Tex. Code Crim. Proc. Ann. art. 59.04(b), (i) (West Supp.1996) (service of process); Art. 59.05 (pleading and trial). The legislature plainly expressed a nonpunitive intent by stating that "asset forfeiture is remedial in nature and not a form of punishment." Art.

59.05(e); but see *Ariza,* 913 S.W.2d at 223 (quoting legislative history stating that statute would "increase the punishment of criminals"). The legislature intended that forfeiture be a proceeding independent of and parallel to the criminal proceedings. *See* Art. 59.05(d) (final conviction not required for forfeiture; dismissal or acquittal in criminal prosecution only raises rebuttable presumption against forfeiture). The legislature intended to create a remedial, civil forfeiture proceeding.

■ Under part two of the test, we must determine whether appellant established by the clearest proof that the legislature provided a sanction so punitive as to transform its intended civil remedy into a criminal penalty. *Ursery,* —— U.S. at ——, 116 S.Ct. at 2148, 135 L.Ed.2d at 569. The Supreme Court wrote that "in rem civil forfeiture has not historically been regarded as punishment." *See id.* at ——, 116 S.Ct. at 2149, 135 L.Ed.2d at 570. The Supreme Court did not set out how punitive the effect would have to be to overcome the stated civil, remedial intent, but instructed that we can consider forfeiture statutes remedial even if they have some punitive effects. *Id.* at ——, 116 S.Ct. at 2148, 135 L.Ed.2d at 569. The Supreme Court found that forfeiture would encourage property owners to ensure that their property was not used for crime. *Id.* at ——–——, 116 S.Ct. at 2148–49, 135 L.Ed.2d at 569–70. The Supreme Court also wrote that forfeiture serves a deterrent purpose apart from any punitive purpose. *Id.* at ——, 116 S.Ct. at 2149, 135 L.Ed.2d at 570. Forfeiting Gaston's truck has the remedial effect of ensuring that he will not use it for criminal purposes again. Further, his absence as a party and failure to appear made the forfeiture hearing essentially an *in rem* proceeding, thus enhancing the non-punitive nature of the proceeding. We do not find the "clearest proof" that the proceeding's punitive nature overwhelmed the legislature's stated intent that the forfeiture be remedial. We find that the forfeiture proceeding below was no more punitive and criminal than the forfeiture proceedings in *Ursery* that the Supreme Court found not to be criminal proceedings. We overrule point four.

**No harmful error in admitting hearsay**

■ Gaston objected to the admission of the following testimony regarding statements made by Valita. One witness testified Valita said that Gaston was angry with Valita and had told her that he was going to shoot her. A second witness testified that Valita said there were problems at home and that Gaston had threatened to shoot her. A third witness testified that Valita said that Gaston did not like her working at garage sales, did not like her tithing practices, was angry with her, and had started out toward a trailer where they kept a gun.

Other evidence of Gaston's guilt obviates a discussion of the correctness of the trial court's decision to allow these hearsay statements. Gaston and Valita had a troubled marriage and were undergoing counseling. He had been upset with Valita for some time; he told their marriage counselor that he (Gaston) was "going to hell and was taking someone with him" (implying Valita); and, on the day of the murder, he had his will notarized and gave his son papers for safekeeping. It is undisputed that he walked calmly into the fellowship hall, pointed the gun at his wife's head, and fatally shot her. As he was wrestled to the ground, he shouted, "I'll send her to hell." When the man who restrained him said he ought to kill Gaston, Gaston replied, "Go ahead and kill me," substantiating the murder-suicide plan. Gaston told one of his subduers that he was not crazy, that he knew what he had done, but that Valita had hurt him. Gaston admitted at trial that the killing was "no thirty minute deal."

In light of the overwhelming evidence of guilt, we can say beyond a reasonable doubt that any error in the admission of the hearsay statements did not contribute to the conviction or punishment. There is no reversible error. Tex.R.App. P. 81(b)(2). We overrule point three.

**No error in refusing to give instructions**

■ Gaston contends that the court should have charged the jury on the lesser-included offenses of voluntary manslaughter and involuntary manslaughter. A court must charge the jury on a lesser offense in addition to the charged offense if (1) proof of the lesser offense is included within the proof necessary to establish the offense charged and (2) some evidence exists in the record that would permit a jury rationally to find the defendant guilty, if at all, of only the lesser offense. *Rousseau v. State*, 855 S.W.2d 666, 673 (Tex.Crim.App.1993). Because the State concedes that both offenses are lesser-included offenses of murder, we will analyze only under the second prong.

We first set out the elements of the offenses under the applicable statutes.[2] Murder occurs if a person intentionally or knowingly causes the death of an individual. Act of May 28, 1973, 63d leg., R.S., ch. 426, art. 2, sec. 1, § 19.02(a)(1), 1973 Tex. Gen. Laws 1122, 1123.[3] Voluntary manslaughter occurs if a person murders while under the "immediate influence of sudden passion arising from an adequate cause." *Id.* at 1124 (§ 19.04(a)).[4] Involuntary manslaughter occurs when a person recklessly causes the death an individual. *Id.* (§ 19.05(a)(1)).[5]

The legislature defined the elements of voluntary manslaughter that distinguished it from murder. *Id.* (§ 19.04(b), (c)).[6] Sudden passion was "passion directly caused by and arising out of provocation by the individual killed ... which passion arises at the time of the offense and is not solely the result of

2. The Penal Code was revised after Gaston killed Valita. We will set out the then-applicable statutes in the text and briefly discuss in footnotes the nature of the revisions.

3. The wording of the old statute cited in the text is the same as the current statute, codified at Tex. Penal Code Ann. § 19.02(b)(1) (West 1994).

4. Sudden passion arising from adequate cause can now be raised only as an affirmative defense or mitigating circumstance at the punishment phase to reduce the degree of the felony and the punishment range. *See* Tex. Penal Code Ann. § 19.02(d) (West 1994).

5. The legislature dropped the word "involuntary" from this offense, codifying the offense of "manslaughter" at Tex. Penal Code Ann. § 19.04(a) (West 1994).

6. These definitions are recodified at Tex. Penal Code Ann. § 19.02(a)(1), (2) (West 1994).

former provocation." Adequate cause was "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection."

■ Gaston contends that his testimony raised the elements of voluntary manslaughter. He spent the morning of the killing futilely trying to repair an air conditioner on a camper so that he and Valita could spend the weekend in it. Valita nagged and taunted him regarding his inability to complete tasks and about an invention of his. She then told him she was moving out. She left after they talked about dividing their property, in which she included the house he had owned with a deceased former wife. He testified that he then went blank or into a trance, stopped thinking, felt hurt and angry, and lost control of himself. He said he felt like the devil took control of him until he heard the gunshot that killed Valita. On appeal, he contends that this period of "demonic possession" eliminated any opportunity for cool reflection from the time Valita left the house until he killed her. We reject his contention.

Even under his version of events, Valita did nothing adequate to cause the requisite degree of emotion in a person of ordinary temper. We grant that nagging, taunting, and promising a divorce and property squabble can be very unpleasant actions. Gaston's counsel artfully argues that Gaston's description of demonic possession is the way an elderly, "hyper-religious" man would describe resultant overwhelming anger, rage, and resentment. His age and religiosity, however, do not excuse him from the legal standard. The evidence did not describe a scenario that would render a person of ordinary temper incapable of cool reflection.

Even if Valita's actions had provided adequate cause for his sudden passion, Gaston did not act immediately under the influence of that passion. The passage of about an hour between their argument and the killing shows that whatever caused him to kill Valita did not arise "at the time of the offense." The evidence showed no provocative action by her at the church fellowship hall where he killed her. Despite his argument that pos-

session by the demons of rage debilitated him from cool reflection, we find no basis to hold that such demonic possession tolls the running of the "immediate influence" period for an hour. Voluntary manslaughter is a limited exception to the murder statute; we will not stretch the limitations requiring immediacy and suddenness to encompass this man whose passion had ample time to subside over the course of the hour as he found his gun, got in his truck, drove to the church, walked into the church, and talked briefly to the churchmembers before pulling out his gun and killing his wife. The court did not err by refusing the voluntary manslaughter instruction. We overrule point one.

■ Gaston's argument for an involuntary manslaughter instruction likewise fails. The critical distinction from murder is that, instead of intending death or serious injury, the killer must merely have been reckless about whether his actions could cause death. People are reckless when they are aware of but consciously disregard a substantial and unjustifiable risk that a result will occur. Tex. Penal Code Ann. § 6.03(c) (West 1994) (unchanged by recodification). Gaston conceded that he knew how the gun worked, including the safety, and the danger the gun posed. He denied that he had any specific intent to kill his wife. Though he stated that the gun just went off, he explained that "that hand done it but I didn't." We do not find support for body parts having intent independent from the remainder of the body and mind. Further, the hand did not act alone. The rest of the body got him out of the house and into the truck, drove across town to the church, and walked into the fellowship hall. The rest of the body got his hand into the position that it could point the gun directly at Valita's head from close range and pull the trigger. The mouth, which had made thinly veiled threats to send Valita to hell, said, "I'll send her to hell" after shooting her. Though the jury might have found that he did not intend to kill Valita, such a finding would have required acquittal. The evidence showed only focused, purposeful action without a hint of recklessness. The court did not err by refusing the involuntary manslaughter instruction. We overrule point two.

Having overruled all points of error, we affirm the judgment.