**Opinion issued April 9, 2026**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-24-00374-CR

———————————

**JASON JERMAINE ARMSTER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 183rd District Court**
**Harris County, Texas**
**Trial Court Case No. 1670075**

---

## MEMORANDUM OPINION

The State charged Jason Jermaine Armster with the murder of Charlene

Grovell (Charlene).[1]  A jury found him guilty and, after finding one enhancement

---

[1]      *See* TEX. PENAL CODE § 19.02(b).

paragraph true, assessed his punishment at 55 years' imprisonment and a $10,000 fine. On appeal, Armster argues that the trial court erred by (1) denying his motion to suppress his custodial statement, (2) admitting testimony about extraneous bad acts, and (3) refusing his request for a jury instruction on the issue of sudden passion.

We affirm.

## Background

Armster and Charlene were married and had a child together. They also each had children from previous relationships.

On the night she was killed, Charlene was in the primary bedroom of the couple's home talking on the phone with her sister, Channon. Armster asked who she was talking to, and Charlene told him it was Channon. Armster did not believe her. He thought that she was cheating on him and was talking to another man. After she got off the phone, Charlene was getting ready to go to sleep, and she told Armster to go to sleep.

Armster did not go to sleep. He retrieved a handgun that he owned and shot Charlene in the back of her neck, killing her.[2] Armster later told police that he shot Charlene because she was going to leave him. After shooting her, Armster

---

[2] At trial, Dr. Pramod Gumpeni with the Harris County Institute of Forensic Sciences testified that, after reviewing Charlene's autopsy report and photos, he concluded that Charlene's cause of death was a gunshot wound to the neck and the manner of death was homicide.

repositioned Charlene in bed and covered her with blankets so that the children would not know she was deceased.

Armster left the house in his car, leaving his and Charlene's three children—ages 3, 5, and 11—home alone. He drove to the Fred Hartman Bridge in Baytown, Texas, where he threw the handgun over the bridge into the water below. Neighborhood surveillance video captured Armster's car leaving the driveway at 3:34 a.m., returning home at 5:04 a.m., and leaving again at 5:13. a.m. Video from the Fred Hartman Bridge showed a car matching the description of Armster's vehicle stop on the bridge's shoulder at 4:12 a.m., someone get out of the car's driver's side, walk to the bridge's guardrail, return to the vehicle, and leave.

Around 8:00 a.m., Armster drove to the Baytown Police Department station and turned himself in for an open traffic warrant. Armster made statements prompting police to ask the Harris County Constable's Office, Precinct 3, to conduct a welfare check on Charlene. When the officers arrived at the home, the eldest child opened the door. The officers searched the home and found Charlene's body in bed covered with blankets.

Investigator A. Thompson with the Homicide Division of the Harris County Sheriff's Office (HCSO) was assigned to investigate the case. Armster was transported to HCSO's detective bureau where Investigator Thompson interviewed him. During the interview, Armster admitted to shooting Charlene and throwing the

3

handgun from the Fred Hartmann Bridge. Testing determined that Armster had gunshot residue on his right hand.

Armster was convicted of Charlene's murder and sentenced to 55 years in prison plus a $10,000 fine.[3] This appeal followed.

## Motion to Suppress

Armster filed a pretrial motion to suppress his custodial statement to Investigator Thompson. Following a hearing, the trial court denied the motion. In his first issue, Armster challenges the trial court's denial. He asserts that the statement violated his Fifth Amendment right to interrogation counsel because the statement was taken after he invoked his right to counsel. Armster acknowledges that Investigator Thompson testified that he reinitiated the interview, but he asserts that the reinitiation and his later waiver of his right to counsel were involuntary.

### A.    Relevant Background

Armster's interview with Investigator Thompson was recorded. The video and audio recordings of the interview were admitted into evidence at the suppression hearing. Investigator Thompson and Armster each testified.

---

[3]    Armster was also charged with the offense of tampering with evidence, which was tried with the murder charge. The jury failed to reach a unanimous verdict on the tampering charge, and the trial court declared a mistrial for that offense.

The video recording shows that Investigator Thompson read Armster his *Miranda* and statutory rights at the start of the interview.[4] Armster indicated that he understood each right. When Investigator Thompson asked him if he waived his rights, Armster was quiet for a while and then said that he "messed up." He indicated that Charlene had cheated on him and explained that he had acquired a handgun for protection after he was robbed a year earlier. Armster then invoked his Fifth Amendment right to counsel by saying repeatedly that he "need[ed] a lawyer." Investigator Thompson stopped questioning him and ended the interview.

Investigator Thompson left the interview room and went to the crime scene at Armster's house. While Investigator Thompson was away, Armster remained in the interview room by himself. Investigator Thompson testified that while he was away, Armster was provided with food, water, and bathroom breaks. During that time, a crime scene investigator also photographed Armster, swabbed his hands for gunshot residue, and obtained a buccal swab—all after obtaining Armster's consent.

After three hours, Investigator Thompson returned. He asked Armster if he needed to go to the bathroom. Armster said he did, and Investigator Thompson and another officer escorted him to the restroom. The interaction between Armster and the officers while outside the interview room was not recorded.

---

[4]     *See Miranda v. Arizona*, 384 U.S. 436 (1966) (expanded and codified in TEX. CODE CRIM. PROC. art. 38.22).

Investigator Thompson testified that, on the way back to the interview room from the bathroom, Armster "advised [him] that he wanted to talk about what happened at the house." Investigator Thompson confirmed that Armster "initiated th[e] conversation." He told Armster not to say anything until he readvised him of his rights.

The video recording shows that, when they returned to the interview room, Investigator Thompson told Armster that he understood that Armster wanted to explain "what actually took place." He readvised Armster of his *Miranda* and statutory rights, and Armster indicated that he understood them. Armster did not reinvoke his right to counsel during the interview. Armster admitted to Investigator Thompson that he shot Charlene. He said that he shot her because she was going to leave him. He used a handgun that he purchased for protection after he was robbed a year earlier. He said that he disposed of the gun by throwing it over the Fred Hartmann Bridge.

In his testimony, Armster denied that he reinitiated the interview. He testified that Investigator Thompson returned to the interview room and asked if he needed to go to the restroom. He said he did, and Investigator Thompson and another officer escorted him to the bathroom. Armster testified that while they were in the bathroom, Investigator Thompson walked up to him and asked if he was "ready to get this off [his] chest." He described Investigator Thompson's tone as "somewhat

aggressive." Armster said that he put his "hands up" as Investigator Thompson walked towards him because he felt threatened and afraid.

He said that Investigator Thompson told him that he knew that he was "not a monster," but "these people think you are." And Investigator Thompson allegedly said, "If you don't tell me something so that I can help you, then I'm gonna have to let you go." He asked Armster if he wanted to tell him what happened, and Armster said "okay." When asked, Armster agreed that he would not have given his statement "[h]ad Detective Thompson not approached [him] and said those words to [him] and with that aggressive tone."

The State recalled Investigator Thompson to the stand to rebut Armster's testimony. Investigator Thompson denied that he raised his voice to Armster. He said that he spoke to him in a calm manner and denied that anything unusual happened in the bathroom. He confirmed that, when a suspect invokes their right to counsel, he does not initiate conversation with them, ask further questions, encourage them to talk, or intimidate them.

The State argued that Armster's statement was voluntary and his right to counsel was not violated because the evidence showed that Armster reinitiated the interview. Armster argued that his right to counsel was violated because Investigator Thompson reinitiated the interview after he invoked his right to counsel.

At the end of the hearing, the trial court denied Armster's motion to suppress, ruled that his statement was admissible, and made oral findings of fact and conclusions of law. Among its findings, the trial court found "it to be credible that after the bathroom break, [Armster] was the one who reinitiated [the] conversation." The trial court also found that Armster's testimony that Investigator Thompson threatened him or that he felt threatened was not credible. The trial court further noted that, after reviewing the video recording, Armster "[did] not appear to be afraid of" Investigator Thompson, "[did] not act like he [was] fearful," or say that he was fearful. The trial court concluded that Armster was given "the appropriate warnings" and that "he knowingly and voluntarily waived his rights after they had been given to him not once but twice."

## B.    Standard of Review

Generally, we review a trial court's ruling on a motion to suppress evidence under a bifurcated standard. *Sims v. State*, 569 S.W.3d 634, 640 (Tex. Crim. App. 2019). We review the trial court's determination of legal questions and its application of the law to facts that do not turn upon a witness's credibility de novo. *Id.* We afford "almost total deference" to the trial court's "findings of historical fact and determinations of mixed questions of law and fact that turn on credibility and demeanor . . . if they are reasonably supported by the record." *Id.* When a trial court

8

denies a motion to suppress, we will uphold that ruling under any theory of the law applicable to the case. *Id.*

If, as here, the trial court makes express factual findings, we view the evidence in the light most favorable to the ruling and determine whether the evidence supports the findings. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). "The evidence and all reasonable inferences are viewed in the light most favorable to the trial court's ruling, and the trial court's ruling must be upheld if it is reasonably supported by the record and is correct under a theory of law applicable to the case." *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023).

## C.     Applicable Legal Principles

The Fifth Amendment prohibits the government from compelling a criminal suspect to bear witness against himself. U.S. CONST. amend V ("No person . . . shall be compelled in any criminal case to be a witness against himself[.]").  To protect the privilege against self-incrimination guaranteed by the Fifth Amendment, police may not conduct a custodial interrogation of a suspect who has requested the assistance of counsel. *Minnick v. Mississippi*, 498 U.S. 146, 147 (1990); *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

In *Edwards*, the United States Supreme Court set out a bright-line rule "designed to protect an accused in police custody from being badgered by police officers." *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983) (discussing *Edwards*).

Once an individual in custody invokes his right to counsel, "interrogation must cease until an attorney is present." *Edwards*, 451 U.S. at 485. Consequently, "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* at 484. Rather, if an accused has expressed his desire to deal with police only through counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85.

*Edwards* requires that, before a suspect in custody can be subjected to further interrogation after he requests an attorney, the evidence must show that the suspect reinitiated dialogue with the authorities. *See id.* Once a suspect has invoked his right to counsel, his unwillingness to communicate with authorities without the presence of counsel "is presumed to persist unless the suspect himself initiates further conversation about the investigation." *Cross v. State*, 144 S.W.3d 521, 526 (Tex. Crim. App. 2004).

The United States Supreme Court has established a two-step procedure to determine whether a suspect has waived his previously invoked right to counsel. *See Bradshaw*, 462 U.S. at 1045–46. The first step requires proof that the suspect himself initiated further communication with the authorities after invoking the right

to counsel. *Id.*; *Cross*, 144 S.W.3d at 527. The second step requires proof that, after he reinitiated communication with the authorities, the suspect validly waived the right to counsel. *Bradshaw*, 462 U.S. at 1046; *Cross*, 144 S.W.3d at 527. "Once this two-step waiver requirement is shown, the suspect has countermanded his original election to speak to authorities only with the assistance of counsel [and] [t]he *Edwards* rule is fully satisfied." *Cross*, 144 S.W.3d at 527.

## D.    Analysis

At the suppression hearing, the trial court heard evidence regarding the interaction between Armster and Investigator Thompson after Armster invoked his right to counsel and about the circumstances surrounding his later reinitiation of the interview. Investigator Thompson testified that when he returned from the crime scene, he escorted Armster to bathroom. On the way back to the interview room, Armster "advised [him] that he wanted to talk about what happened at the house." Investigator Thompson confirmed that Armster "initiated th[e] conversation." He told Armster not to say anything until he could readvise him of his rights.

In contrast, Armster testified that Investigator Thompson reinitiated communication in the bathroom. Armster said that Investigator Thompson asked him if he was "ready to get this off [his] chest," acted aggressively towards him, and made remarks with a threatening subtext.

Although the record contains conflicting evidence regarding whether Armster reinitiated the conversation, the trial court was the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *See Valtierra*, 310 S.W.3d at 447. The trial court found "it to be credible" that Armster, not Investigator Thompson, reinitiated the conversation. Viewing the evidence in the light most favorable to the trial court's ruling, the trial court could have believed Investigator Thompson's testimony that Armster reinitiated contact and disbelieved Armster's testimony, and we must defer to the trial court's factual findings and determinations of credibility. *See id.*; *Wharton v. State*, 711 S.W.3d 92, 108 (Tex. App.—Houston [1st Dist.] 2024, pet. ref'd) (deferring to trial court's implied findings that it believed police officer's testimony that appellant reinitiated conversation after invoking right to counsel and disbelieved appellant's conflicting testimony that police officer reinitiated conversation). Thus, the first *Edwards* step was satisfied. *See Wharton*, 711 S.W.3d at 108.

Once it is demonstrated that the suspect reinitiated contact with police, the next inquiry is "whether a valid waiver of the right to counsel . . . occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Bradshaw*, 462 U.S. at 1046 (quoting *Edwards*, 451 U.S. at 486 n.9). This determination depends on the

12

"particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Id.*

On appeal, Armster argues that he did not voluntarily waive his right to counsel because, after he invoked his right to counsel, the police did not provide him with an attorney, allow him to call an attorney, or take him before a magistrate while Investigator Thompson was away. He asserts that leaving him alone in the interview for three hours without "explanation[] of his status, and no communication about the status of his request for a lawyer" was a "highly coercive environment" that rendered his "re-initiation of contact and the waiver that followed" ineffective and involuntary. We disagree.

*Edwards* does not require the police to provide an attorney immediately to a suspect who has invoked his right to interrogation counsel, and Armster does not cite legal authority requiring as much.[5] Rather, *Edwards* requires that a suspect who

---

[5] To support his position, Armster cites *Michigan v. Mosley*, 423 U.S. 96 (1975). However, *Mosley* is inapposite to the situation presented here. In *Mosley*, the Supreme Court "addressed the circumstances under which the prosecution is prohibited from using a defendant's in-custody statement obtained by police who have renewed interrogation after the defendant has invoked his *right to remain silent.*" *Murphy v. State*, 766 S.W.2d 246, 248 (Tex. Crim. App. 1989) (emphasis added) (discussing *Mosley*). In contrast, when, as here, a suspect invokes *his right to interrogation counsel* but then provides an in-custody statement to police, the admissibility of his statement is governed by the *Edwards* rule. *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981); *Cross v. State*, 144 S.W.3d 521, 526–27 (Tex. Crim. App. 2004). The Court of Criminal Appeals explained:

> In *Edwards*, the Supreme Court distinguished the waiver of the right to remain silent from the waiver of the right to counsel. When a suspect invokes

13

invokes his right to counsel during police questioning may not be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484–85; *see Cross*, 144 S.W.3d at 529 (recognizing that "[t]he critical inquiry is whether the suspect was further interrogated before he reinitiated conversation with law enforcement officials").

Here, the suppression evidence showed that Armster was not subject to interrogation after he invoked his right to counsel until after he reinitiated communication with Investigator Thompson. Armster was not questioned during the three-hour period when Investigator Thompson was at the crime scene. During that time, he was given food, water, and taken to the restroom. He also consented to being photographed and having buccal and gun-residue swabs taken,[6] but he was not subject to interrogation.

---

his right to remain silent, that right may, under certain circumstances, be waived by responding to later police-initiated questioning as explained in [*Mosley*]. However, when a suspect invokes his right to counsel, a valid waiver cannot be established by the mere fact that he responded to later police-initiated questioning. A waiver of the right to counsel requires "additional safeguards" to protect the suspect from police badgering him into waiving that right.

*Cross*, 144 S.W.3d at 526 n.11 (internal citations omitted).

[6] A request for consent to search is not considered interrogation within the meaning of *Miranda* because the giving of consent is not a self-incriminating statement. *See Jones v. State*, 7 S.W.3d 172, 175 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) (holding that appellant's signing of written consent form to search his vehicle after

14

As shown by the record and found by the trial court, interrogation did not resume until after Armster reinitiated communication, Investigator Thompson readvised Armster of his rights, and Armster indicated that he understood those rights.

At the suppression hearing, Armster testified that he resumed the interview because Investigator Thompson used an aggressive tone with him and acted in a threatening manner. He agreed that he would not have given his statement if Investigator Thompson "[had] not approached [him] and said those words to [him] and with that aggressive tone." In other words, Armster indicated that he waived his right to counsel because of Investigator Thompson's alleged aggressive and threatening conduct—not because of a failure to appoint counsel during Investigator Thompson's absence.

Regarding the alleged threatening conduct, Investigator Thompson testified that he did not threaten Armster or using an aggressive tone. Instead, he spoke calmly to Armster, did not raise his voice, and did not reinitiate the interview. The

invoking his right to counsel did not violate his Fifth Amendment right to counsel because actions of police in asking for consent to search "[did] not constitute re-interrogation under *Miranda*"); *see also Magee v. State*, No. 14-23-00396-CR, 2024 WL 3980248, at *6–7 (Tex. App.—Houston [14th Dist.] Aug. 29, 2024, pet. ref'd) (mem. op., not designated for publication) (recognizing that asking for consent to search is not interrogation under *Miranda* and rejecting appellant's argument that his consent to search his phone was obtained involuntarily even though "he had requested appointment of counsel, but none had been appointed, and his *Miranda* rights were not re-read to him").

video recording showed that, after Armster and Investigator Thompson returned to the interview room, the conversation between them was calm and respectful. The trial court found that Armster did not appear fearful or afraid of Investigator Thompson and did not say that he felt threatened. The court also found Armster's testimony that Investigator Thompson threatened him or that he felt threatened was not credible. And we must defer to the trial court's findings and credibility determination. *See Valtierra*, 310 S.W.3d at 447; *Wharton*, 711 S.W.3d at 108.

A review of the suppression record shows that the totality of the circumstances supported the trial court's conclusion that Armster "knowingly and voluntarily" waived his right to counsel. Evidence showed that Armster reinitiated the interview, and he and Investigator Thompson returned to the interview room. There, Investigator Thompson told Armster that he understood that Armster wanted to explain "what actually took place." Armster did not say otherwise. Investigator Thompson then readvised Armster of his rights, and Armster indicated that he understood them. Armster proceeded to give his statement and did not reinvoke his right to counsel. The second *Edwards* step was thus also satisfied. *See Bradshaw*, 462 U.S. at 1046 (agreeing with trial court's conclusion that appellant's statements were voluntary and result of knowing waiver based on its findings that "police made no threats, promises or inducements to talk, that defendant was properly advised of

16

his rights and understood them and that within a short time after requesting an attorney changed his mind without any impropriety on the part of the police").[7]

Accordingly, we conclude that the admission of Armster's custodial statement was not prohibited by the Fifth Amendment. We therefore hold that the trial court did not err in denying Armster's motion to suppress on this basis.

We overrule Armster's first issue.

### Evidentiary Challenge

Charlene's sister, Channon, testified at trial. In his second issue, Armster contends that the trial court erred when it admitted Channon's testimony about his extraneous bad acts. He asserts that admission of the testimony violated Rule of Evidence 403. *See* TEX. R. EVID. 403 (providing that court may exclude relevant evidence if its probative value is substantially outweighed by danger of unfair prejudice).

### A. Relevant Background

Outside the jury's presence during the guilt-innocence phase, the State informed the trial court that it planned to elicit testimony from Channon about an

---

[7] *See also Spence v. State*, No. 09-08-00369-CR, 2010 WL 2533776, at *7 (Tex. App.—Beaumont June 23, 2010, pet. ref'd) (mem. op., not designated for publication) (concluding that appellant had voluntarily, knowingly, and intelligently waived his right to counsel in satisfaction of second *Edwards* step because evidence showed that appellant was advised of his *Miranda* rights after reinitiating interviews, indicated he understood his rights, participated in interviews, and never reinvoked his right to counsel).

extraneous incident from 2014—six years before Charlene's murder—during which she witnessed Armster chase Charlene with a hammer. The State also planned to elicit testimony that Armster would "watch [Charlene] and where she went," including following her in his car.

Armster objected that the testimony would violate several Rules of Evidence, including Rule 403. The trial court overruled Armster's objections, indicating that the testimony was admissible under Code of Criminal Procedure articles 38.36 and 38.371. *See* TEX. CODE CRIM. PROC. arts. 38.36(a) (providing that, in murder prosecution, State or defendant may "offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense"), 38.371(b) (providing that, in prosecution of family-violence offense, each party may offer evidence of all relevant facts and circumstances that would assist trier of fact in determining whether actor committed offense, including evidence regarding nature of relationship between actor and alleged victim).

Channon testified about the hammer incident over Armster's running objection. She said that in 2014 she lived in the same townhouse complex as Armster and Charlene. One evening, Charlene "rapidly knock[ed]" on Channon's door. Channon opened the door and saw Charlene crying and "very, very scared."

18

She let Charlene in and locked the door. She said that they talked for a few minutes. They then heard Armster outside. Channon opened the door and saw Armster. She testified that she also saw a hammer "on the side of [her] apartment" that was not there before Armster arrived.

Channon also testified that Armster would drive by her townhome when Charlene was there and park nearby. She said that "he did it all the time."

On appeal, Armster asserts that Rule of Evidence 403 barred the admission Channon's testimony about Armster's 2014 behavior regardless of whether the testimony was admissible under articles 38.36(a) and 38.371(b). In its response, the State contends that, even if that trial court erred in admitting the complained-of testimony, any error was harmless. Assuming without deciding that the trial court erred in admitting the testimony, we agree that any error was harmless.

## B. Applicable Legal Principles

"The erroneous admission of evidence is non-constitutional error." *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018). Rule of Appellate Procedure 44.2(b) provides that an appellate court must disregard non-constitutional error not affecting a criminal defendant's substantial rights. *See* TEX. R. APP. P. 44.2(b). An error affects an appellant's substantial rights only when the error has "a substantial and injurious effect or influence in determining the jury's verdict." *Cook v. State*, 665 S.W.3d 595, 599 (Tex. Crim. App. 2023).

19

After examining the record as a whole, if we have fair assurance that the error did not influence the jury—or had but a slight effect—we will not reverse an appellant's conviction. *Gonzalez*, 544 S.W.3d at 373. In making that determination, we consider (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained-of error. *Id.*

## C.  Analysis

Here, the alleged error was the admission of Channon's testimony in which she described Armster's extraneous bad acts toward Charlene. Other than introducing it, the State did not emphasize the complained-of testimony. While the State mentioned Channon in its closing argument, it did not mention the extraneous acts.

The complained-of testimony served to provide insight into the nature of Armster and Charlene's relationship, which in turn provided context for Charlene's murder. In the guilt-innocence charge, the trial court instructed the jury that it could only consider Armster's extraneous bad acts "in determining the nature of the relationship between [Charlene] and [Armster] and the condition of the mind of [Armster] at the time of the offense, if any, alleged against him in the indictment and

for no other purpose." We presume that the jury followed the instruction. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009).

When analyzing Rule 44.2(b) harm, we consider how the complained-of testimony might be viewed in connection with the other evidence. Doing so reveals that it likely had little effect on the jury's verdict for two reasons. First, the evidence of Charlene's murder—which included crime scene photos—was much more disturbing than Channon's testimony about Armster's extraneous bad acts. *See Leal v. State*, No. 01-14-00972-CR, 2016 WL 796950, at *8 (Tex. App.—Houston [1st Dist.] Mar. 1, 2016, pet. ref'd) (mem. op., not designated for publication).

Second, the record contains overwhelming evidence of Armster's guilt. *See Werner v. State*, 412 S.W.3d 542, 551 (Tex. Crim. App. 2013) ("Overwhelming evidence of guilt is a relevant factor in any Rule 44.2(b) harm analysis[.]"). In his recorded statement, Armster admitted to shooting Charlene because he thought she would leave him. The evidence showed that the gunshot killed Charlene. Armster confessed to disposing of the gun by throwing it over the Fred Hartman Bridge. Neighborhood surveillance video showed Armster leaving and returning home during the timeframe that bridge's video showed a vehicle matching the description of Armster's car parked on the shoulder of the bridge and someone from the vehicle walk to the bridge's guardrail. The evidence also showed that Armster's right hand tested positive for gunshot residue.

Assuming without deciding that the trial court erred, we conclude the admission of Channon's complained-of testimony did not affect Armster's substantial rights because, after examining the record as a whole, we have a fair assurance that the error did not influence the jury or had but a slight effect. *See Cook*, 665 S.W.3d at 599; *Gonzalez*, 544 S.W.3d at 373. Accordingly, we hold that, even if the trial court erred in admitting the testimony, the error was harmless. *See* TEX. R. APP. P. 44.2(b).

We overrule Armster's second issue.

### Sudden Passion

At the punishment-phase charge conference, the defense requested the trial court to instruct the jury on the issue of sudden passion. Defense counsel explained the request as follows:

> The State did reoffer all evidence from the guilt/innocence portion of the trial. The Court admitted that, obviously, subject to my objections and the Court's previous rulings. So, all of that evidence is before this jury at this point.
>
> [Investigator] Thompson did testify various times that he believed that Mr. Armster believed at the time that his wife, then wife, Charlene, was potentially cheating on him. It was not her sister, Channon, on the phone during the phone call and that he believed she was going to leave him. Mr. Armster stated that during the statement several times that that's why he did it. In fact, it was the first time that I recall it coming up was on the video statement and audio statement when [Investigator] Thompson asked twice, I'm going to ask you straight up, did you shoot your wife? And then the second time, did you shoot your wife; and he nodded his head. [Investigator] Thompson said, "why?" [and Armster] said, "Because she was gonna leave me."

22

So, there were the facts and circumstances from that night, the evidence has raised the issue for the jury to determine whether or not that would be adequate cause.

The trial court denied Armster's request for the sudden-passion instruction. In his third issue, Armster asserts that the trial court erred in denying his request.

## A. Applicable Legal Principles

During the punishment phase of a murder trial, a defendant may assert that he caused the death while under the immediate influence of sudden passion arising from "an adequate cause". TEX. PENAL CODE § 19.02(d). "If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree." *Id.*

The Penal Code defines "sudden passion" as "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). The "adequate cause" required to establish sudden passion is a cause "that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1).

A defendant is entitled to a sudden-passion instruction if the record "at least minimally" supports the following inferences:

1. that the defendant was acting under the immediate influence of passion, such as terror, anger, rage, or resentment;

23

2.   that his sudden passion was in fact induced by some provocation by the deceased, which provocation would commonly produce such a passion in a person of ordinary temper;

3.   that he committed the murder before regaining his capacity for cool reflection; and

4.   that a causal connection existed "between the provocation, passion, and homicide."

*Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013).

The trial court should instruct the jury on the issue of sudden passion if it is raised by the evidence, even if that evidence is weak, impeached, contradicted, or unbelievable. *Trevino v. State*, 100 S.W.3d 232, 237 (Tex. Crim. App. 2003). But "the evidence cannot be so weak, contested, or incredible that it could not support such a finding by a rational jury." *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005). "An appellate court's duty is to look at the evidence supporting the charge of sudden passion, not the evidence refuting it." *Beltran v. State*, 472 S.W.3d 283, 294 (Tex. Crim. App. 2015).

**B.    Analysis**

To support his claim that he was entitled to a sudden-passion instruction, Armster relies primarily on his custodial interview and Investigator Thompson's testimony about it. During the interview, Armster said that he knew Charlene had cheated on him "a long time ago." He indicated that she had more recently cheated

on him and knew that she was seeing someone else. Armster did not answer questions about how recently Charlene had cheated or how he learned about it. Instead, he remarked that he "put up with [Charlene], but [he] knew what [she] was doing."

Armster explained that Charlene had the power in the relationship because she made more money than him. He said that Charlene discouraged him from getting a job because she thought he would leave her if he gained financial independence, but she also ridiculed him for his lack of employment.

Armster stated that, on the night of the murder, he heard Charlene on the phone in the bedroom. When he walked in, Charlene "tried to act like it was somebody else." Investigator Thompson understood this to mean that Armster believed Charlene was talking to another man. Armster said that Charlene told him that she was talking to her sister, but he did not believe her.

Investigator Thompson testified that he tried to determine why Armster shot Charlene. When asked, Armster denied that he and Charlene were arguing before he retrieved the gun. Instead, Armster expressed several times that he shot Charlene because she was going to leave him. He said that Charlene said that she would leave. Investigator Thompson testified that it was his "impression" that Armster "believed that [Charlene] was going to leave, so that's what actually, what I believe triggered this whole situation."

When asked, Armster said that Charlene was not getting dressed to go out that night. She was getting ready to go to sleep. However, Armster thought Charlene was not really going to sleep. He believed that Charlene was going to leave and was trying to get him to go to sleep. When he tried to talk to her, she told him to "take his ass to sleep."

On appeal, Armster asserts that "[t]he record amply supports an inference that Armster acted under the immediate influence of anger, rage, *and* resentment, and that his wife's sarcastic dismissiveness, in the context of their relationship, would produce such a passion in a person of ordinary temper." We disagree. "Courts have consistently held that verbal arguments, domestic disputes, marital discord, and refusals to communicate do not constitute adequate cause for sudden passion." *Reed v. State*, No. 14-24-00762-CR, 2025 WL 3718795, at *7 (Tex. App.—Houston [14th Dist.] Dec. 23, 2025, no pet.) (mem. op., not designated for publication); *see Gaston v. State*, 930 S.W.2d 222, 226 (Tex. App.—Austin 1996, no writ) (holding wife's "nagging, taunting, and promising a divorce and property squabble" were not adequate causes giving rise to sudden passion).[8]

---

[8] *See also McKinney v. State*, 179 S.W.3d 565, 570 (Tex. Crim. App. 2005) ("yell[ing]" and "verbal taunting and physical pushing" insufficient to constitute adequate cause justifying the issuance of a jury instruction on sudden passion); *Marquez v. State*, 697 S.W.3d 485, 511 (Tex. App.—El Paso 2024, pet. ref'd) (concluding that "anger, rage, or resentment arising from the rejection of a romantic proposal, without more, does not constitute adequate cause giving rise to sudden passion"); *McClinton v. State*, No. 01-20-00779-CR, 2021 WL 4156012, at *4 (Tex.

"Sudden passion is an extreme emotional and psychological state." *Dukes v. State*, 486 S.W.3d 170, 180 (Tex. App.—Houston [1st Dist.] 2016, no pet.). "Ordinary anger does not justify a sudden passion instruction." *Id.* While it might have been cause for anger, rage, or resentment, Charlene's conduct would not drive a person of ordinary temper to a violent passion. *See* TEX. PENAL CODE § 19.02(a); *Wooten*, 400 S.W.3d at 605.

Nor were Charlene's actions the type that would make an ordinary person's mind incapable of cool reflection. *See* TEX. PENAL CODE § 19.02(a)(1); *Gaston*, 930 S.W.2d at 226 (determining that, while they "were unpleasant actions," wife's actions directed toward husband of nagging, making belittling and taunting remarks, and stating that she was moving out "did not describe a scenario that would render a person of ordinary temper incapable of cool reflection").[9] As one court recognized, "One would think that husbands and wives of ordinary temper . . . could discover a spouse's infidelity without murdering their spouse." *Bradshaw v. State*, 244 S.W.3d 490, 503 (Tex. App.—Texarkana 2007, pet. ref'd). Here, the evidence—consisting

---

App.—Houston [1st Dist.] Sept. 14, 2021, no pet.) (mem. op., not designated for publication) ("A verbal confrontation, without more, cannot support a finding of sudden passion because insulting language does not rise to the level of adequate cause.").

[9] *See also Hernandez v. State*, 127 S.W.3d 206, 213 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (recognizing that actions that "would not render the ordinary person's mind incapable of cool reflection," such as "one partner wish[ing] to date someone else," are not adequate cause of sudden passion).

of relationship conflict, infidelity, marital breakup, and Charlene's dismissive remark—did not constitute legally adequate cause. *See* TEX. PENAL CODE § 19.02(a)(1); *Reed*, 2025 WL 3718795, at *7; *Gaston*, 930 S.W.2d at 226.

Armster also did not offer any evidence showing that he acted under the immediate influence of sudden passion before he could regain "his capacity for cool reflection." *See Wooten*, 400 S.W.3d at 605. Investigator Thompson asked Armster where Charlene was when he shot her. Armster responded, "In bed, she was getting up." Armster also indicated that he was standing at the foot of the bed when he shot Charlene. But Armster did not state when he retrieved the gun that night. Nor did the evidence show when he last interacted with Charlene before he shot her.

"The mere fact that a defendant acts in response to the provocation of another is not sufficient to warrant a charge on sudden passion. Instead, there must be some evidence that the defendant was under the immediate influence of sudden passion" and did not have the opportunity for cool reflection before committing the offense. *Trevino*, 100 S.W.3d at 241; *see McKinney*, 179 S.W.3d at 569. Here the record lacks evidence of this requirement. *Cf. Walters v. State*, No. 09-19-00388-CR, 2021 WL 5498213, at *6 (Tex. App.—Beaumont Nov. 24, 2021, pet. ref'd) (mem. op., not designated for publication) (determining record lacked any evidence of "contemporaneous provocation" where complainant told appellant that she wanted to break up with him and about one hour later, he went to her home and assaulted

28

her and then retrieved a knife and stabbed her to death); *Gaston*, 930 S.W.2d at 226 (concluding husband "did not act immediately under the influence of [sudden] passion" because he murdered his wife "about an hour" after they argued).

Accordingly, we conclude that the record does not support the submission of a sudden-passion instruction. *See* TEX. PENAL CODE § 19.02(d).  We therefore hold that the trial court did not err in refusing to include the instruction.

We overrule Armster's third issue.

## Conclusion

For all the reasons above, we affirm the judgment of the trial court.


Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Gunn and Johnson.

Do not publish. TEX. R. APP. P. 47.2(b).